THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANGELO ROBINSON *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-1100

Opinion filed February 2, 1979.

Ralph Ruebner and Susan Solovy, both of State Appellate Defender's Office, of Chicago, for appellants.

748

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Pamela L. Gray, and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendants Arnell and Angelo Robinson were found guilty of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and sentenced respectively to 20 to 40 years and 40 to 120 years in the Illinois Department of Corrections. On appeal, they contend that (1) they were denied their right to be tried by an impartial jury when a juror's purse was stolen while she was sequestered, (2) the trial court erred in refusing to allow the contents of a police report to be used to impeach the police officer who prepared the report, and (3) the sentences imposed by the trial court are excessive.

The following pertinent evidence was adduced at trial.

*For the State*

*Harry White*

On July 7, 1974, he met the deceased, Milton Jackson, at 207 South Albany, Chicago, Illinois. Jackson gave him $400 in cash for the purchase of his 1965 Cadillac Coupe de Ville and promised to pay him an additional $100 the next day. Jackson took possession of the automobile. Jackson returned with the automobile the next day at about 9:30 or 10 a.m. and met him on the front steps of a building at 200 South Albany. Jackson complained that the car would not start properly and requested his money back. He returned the $400 cash to Jackson. There were other people in the area at the time. Jackson, after counting the money, put it in his pocket and then "walked down the street to the corner."

About 45 minutes to an hour later, as he stood in front of a house at 207 South Albany, he heard people hollering and saw, about 150 feet away, two men jump on Jackson. Five or six other people whom he could not identify were in the area. Two men were "beating Jackson up, kicking him around." Another man was "standing up waving a gun." These three men next ran into the street where "one reached and got the gun from the other one and came back." This man shot the gun twice. After the second shot Jackson fell. The three men ran, "up the alley east towards Whipple Street." He was not able to identify these three men because he did not see their faces nor was he able to describe their clothing.

*Roosevelt Harris*

He arrived at a vacant lot "in the general area of Albany, Jackson and 5th Avenue" at about 8 a.m. on July 8, 1974. This was "where I usually hang around." Approximately 11 or 12 other people were present including Milton Jackson, Earl Lacy and Preacher. At about 9:15 or 9:30

a.m. Jackson walked across the street to some steps where he spoke with another man for 15 minutes. When Jackson returned, "I asked him, did he get his money." He replied that he did. Approximately one half-hour to an hour later three men approached from the east and surrounded Jackson. One of the men pointed what appeared to be a .32 caliber gun "to the back of Jackson's head" and said, "This is a stickup." The other two men grabbed Jackson and began kicking and beating him. The man with the gun waved everyone back. Jackson held his hand in his pocket, "like he was trying to hold onto his money." This fight continued several minutes. The gunman then put the gun in his pocket and tried to take the money from Jackson. Preacher grabbed a pipe and swung it at the three attackers who jumped off Jackson and ran about 15 feet down Albany Avenue. One of the men then took the gun from the other one and said, "I'll kill him." This man then shot the gun. Jackson swung a pipe, and the man fired a second shot. Jackson then fell on his face. The three attackers then ran east "down the alley to Whipple and Albany."

He identified the three attackers in a lineup on July 9, 1974. At trial he identified defendants as two of those three men he had identified in the lineup and stated that they were the same men he had seen struggling with Jackson.

On cross-examination he testified that neither of the defendants was the man who originally held the gun. He had never seen the three men before July 8, 1974.

*Earl Lacy*

He was present in the vacant lot with Jackson prior to and at the time of the shooting. He substantially corroborated the testimony of Roosevelt Harris concerning the incident, adding that he was about six feet from the fight and never turned his back. He testified that he identified the three attackers in a lineup on July 9, 1974. He identified defendants in court as two of the men who attacked Jackson and indicated that Arnell Robinson fired the shots.

On cross-examination he testified that he did not see either Jackson or Preacher pick up a pipe. He observed the three men as they ran away after the shooting. They ran together down the alley to Whipple, but he could not tell how far apart they were.

*Will "Preacher" Ayers*

He was the brother-in-law of Milton Jackson and was present at the scene of the shooting. He substantially corroborated the testimony of Harris and Lacy concerning the incident. He testified that he tried to pull one of the men off of Jackson, but "he kicked me and knocked me down." He then obtained a pipe from an old car that was on the vacant lot and tried to hit them but missed. Two of the men appeared scared and ran into the street. The third one ran and grabbed the gun from one of the

other men. This man then came back and fired two shots at Jackson, the first hitting a windshield, the second hitting Jackson. Jackson fell on his face and the three men ran away. Ayers further testified that he then removed the cash from Jackson's pocket and gave it to Jackson's wife.

In a police lineup on July 9, 1974, he was able to recognize two men who were involved in the shooting. He identified Arnell Robinson in court as one of the men he had recognized in the lineup and stated that Arnell Robinson was one of the men he saw in the struggle with Jackson.

On cross-examination he admitted that he had known Jackson for about 18 years and wanted to see those responsible for his death punished. He heard the man who shot Jackson say, "Give me the gun. I'll kill this so and so." He did not recall Angelo Robinson as being one of the attackers.

*Pasqual Culala*

On July 9, 1974, while employed as a forensic pathologist by the Cook County Coroner, he performed an autopsy on the body of Milton Jackson. He determined that Jackson died as a result of a bullet wound to the back causing lacerations of the lungs and aorta.

*James Sperpe*

Although at the time of trial he was deputy chief of police of Dania, Florida, on July 8, 1974, he was an officer with the Chicago Police Department. At about 11:45 a.m. on that date he was assigned to investigate the shooting of Milton Jackson. After interviewing a number of witnesses he and his partner, Officer Seery, arrested Arnell and Angelo Robinson together in a room at the Coolidge Hotel. The Robinsons were awake when the officers arrived. A few minutes later the officers also arrested Melvin Ware. The Robinsons and Ware were then placed in a lineup with four other individuals. Roosevelt Harris, Willie Ayers and Earl Lacy viewed this lineup.

After the lineup he informed Angelo Robinson of his constitutional right to remain silent. Nevertheless, Angelo informed him and Seery, "that he did in fact shoot Milton Jackson, that it was in self-defense, that Milton Jackson had picked up a pipe and was coming at him with this pipe."

On cross-examination he admitted that in his police report he stated that Angelo and Arnell Robinson were asleep when he found them in the hotel room. He admitted that he did not recover a gun from the Robinsons in the hotel room.

*John Lacy*

On July 8, 1974, he was working as a plasterer in a building near the scene of the shooting. As he was bringing some rubbish out to a garbage can a little before noon, he saw "three dudes run through the alley." They were about half a block from him. He had seen all three of

them in the neighborhood before and recognized two of them as Melvin Ware and Angelo. He did not know Angelo's last name. He did not know the name of the third man, but had last seen him approximately a month earlier. At trial he identified Angelo and Arnell Robinson as two of the men he had seen running through the alley.

On cross-examination he denied telling the police originally that he saw only two people running in the alley. He told them he saw three men and that he knew two of them. Although the men were in his view for about 10 seconds as they ran, he admitted that for part of this time he could see only their backs and sides. He also admitted that it was not unusual to see people running around the neighborhood so he had no special reason to pay close attention to the three men. He further admitted that they did not actually run past him.

*Patrick Seery, Chicago Police Officer*

On July 8, 1974, he was assigned to investigate the homicide of Milton Jackson along with Sperpe. He substantially corroborated Sperpe's testimony concerning the initial investigation and the arrest of Angelo and Arnell Robinson. Angelo was advised of and admitted he understood his "constitutional rights." Angelo at first said that "he had nothing to do with it, that he was on the far west side" and requested an attorney. The officers then terminated the interview. As he was typing his report, Angelo suddenly stated that, "he shot the man in self-defense, that they were going to rob the man and the man swung a pipe at him and he shot him." He and Sperpe were the only ones in the room with Angelo. Angelo again requested an attorney, and the conversation ceased.

On cross-examination he testified that during his investigation John Lacy told him that he had seen three men running in the alley.

*For the Defendants*

*Detry Robinson*

She is the sister of Angelo and Arnell Robinson. On July 8, 1974, she was living with her three children and her brother Arkbar Robinson on the South Side of Chicago at 5923 S. Loomis. At about 9 a.m. on that date she left her home with her children and went to visit a friend. When she returned home the same day at about 1 or 1:30 p.m., Angelo Robinson and Michael Davis were present. They had not been there when she left in the morning. They had painted her bedroom that morning.

On cross-examination she admitted that she did not know where Angelo was between 11:30 a.m. and 12:30 p.m. on July 8, 1974.

*William Michael Davis*

After his cousin Angelo Robinson arrived at his home at 2932 W. Jackson in Chicago at about 8:30 a.m. on July 8, 1974, they rode a bus to Detry Robinson's house at 5923 S. Loomis, arriving there at about 9 a.m.

Detry's brother Arkbar was present when they arrived. He and Angelo painted Detry's bedroom until about noon. During the entire morning Angelo did not leave his presence.

*Angelo Robinson on his own behalf*

After spending the previous evening at his grandmother's house at 2932 W. Jackson, he left on July 8, 1974, between 8:30 a.m. and 9 a.m. with Michael Davis. They took a bus to his sister Detry's house at 5923 S. Loomis. When they arrived there approximately 45 minutes later, his brother Arkbar Robinson was present. Arkbar left about 25 minutes later. He and Davis painted his sister's bedroom, taking about an hour and a half. Shortly after his sister returned at about 12:30 p.m., he and Michael left.

He denied that he attempted to rob Milton Jackson on July 8, 1974, or that he even saw Jackson on that date. He denied that he was at a vacant lot on Albany between Jackson Blvd. and 5th Avenue on that date, but testified that he was with Michael Davis until "close to eleven o'clock" that night. After leaving Davis he went to the Coolidge Hotel at 2950 W. Jackson Blvd. He went there to sleep rather than disturbing his grandparents at home. When he arrived at the hotel his brother Arnell was there. The following morning he and Arnell were arrested in the hotel and placed in a lineup at the police station. After the lineup he sat alone "handcuffed to a wall for maybe six or eight hours." Sperpe and Seery were also present. Although they told him that he should plead self-defense and "go home tomorrow morning with maybe five years probation," he did not tell them he shot Jackson in self-defense.

On cross-examination he admitted that he had seen John Lacy in the neighborhood prior to July 8, 1974 but did not know him by name.

*For the State—Rebuttal*

*Wayne Kameron, Cook County Sheriff's Police Officer*

On March 1, 1977, he interviewed William Michael Davis. Davis stated that from approximately 9 a.m. until 1 p.m. on July 8, 1974, he and Angelo Robinson were painting at the house of Angelo's sister and that the house "was somewhere on the West Side." Davis did not give him the exact address.

The jury found both defendants guilty of murder. Arnell Robinson received a sentence of 20 to 40 years while Angelo Robinson received a sentence of 40 to 120 years. Defendants now appeal both their convictions and the sentences imposed by the trial court.

OPINION

Defendants first contend that their right to an impartial jury was

violated when one of the jurors had her purse stolen while the jury was sequestered in a motel. During jury deliberations the trial court announced that the following written communication had been received from the jury:

"Number 1. We are seriously concerned about the lack of security afforded this panel last night.

Number 2. The incident last night did not affect the verdict we have reached."

The trial court also announced that it had been orally informed by the jury that, "we have reached a verdict." The trial court then informed all parties that one of the jurors had her purse stolen from her motel room while sequestered the night before and that all members of the jury had become aware of this occurrence. When informed of these facts by the trial court, defendants each stated that they wished to reserve the right to move for a mistrial until after the verdicts, which had already been reached, were read.

Following the announcement that the jury had found them guilty of murder, defendants moved for a mistrial and asked the trial court to poll the jury. The trial court proceeded to individually examine each member of the jury regarding the purse incident. Each juror stated that the verdict was truly his or her verdict and that he or she had become aware of the stolen purse incident prior to the jury reaching a verdict. Although most members expressed concern and dismay over the lack of security provided for them, each juror stated that the incident did not affect his or her ability to render a fair and impartial decision. Based upon his examination of the jury, the trial court stated that defendants had failed to demonstrate prejudice resulting from the stolen purse incident and denied the motion for a mistrial.

The granting of a mistrial where there is a showing of improper conduct affecting the jury is within the sound discretion of the trial court, and, absent a demonstration of prejudice to the defendant, a ruling denying a mistrial is proper. (*People v. Dolgin* (1953), 415 Ill. 434, 114 N.E.2d 389.) In *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829, our supreme court specifically held that the fact that a juror had been the victim of a theft while sequestered did not necessarily mandate a mistrial. In *Cannon* the court stated that:

"Defendants contend further that the court erred in refusing to declare a mistrial when one of the jurors, who had been sequestered, reported that his razor blades had been stolen. The record shows the court interrogated the juror who stated the incident would have no effect upon his ability to fairly decide the case and that defendants' counsel then waived interrogation of this

juror and the remaining jurors. In our opinion defendants were not prejudiced and the trial judge correctly denied the motion for a mistrial." 49 Ill. 2d 162, 167, 273 N.E.2d 829, 832.

Although it is true, as defendants note, that the incident in *Cannon* occurred prior to the case going to the jury, we fail to see how such a distinction renders the reasoning of that case inapplicable here.

■■ We do not believe that the trial court in the present case abused its discretion in denying the motion for a mistrial as the record reveals no prejudice to defendants' rights. The trial court properly safeguarded defendants' right to a fair trial by thoroughly questioning each juror as to the existence of prejudice. Each juror stated unequivocally that the incident did not contribute to his or her determination of defendants' guilt or innocence. It is, of course, true that the statements of the jurors are not necessarily conclusive on the question of prejudice and that each case must be determined on its own peculiar facts and circumstances. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 150 N.E.2d 806.) However, we do not believe the fact that the jury was aware that a juror's purse had been stolen involved such a probability of prejudice to defendants as to be "deemed inherently lacking in due process." (*Estes v. Texas* (1965), 381 U.S. 532, 542, 543, 14 L. Ed. 2d 543, 550, 85 S. Ct. 1628, 1633.) Considering both the nature of the alleged prejudicial incident itself and the statements of the jurors to the trial court, we believe the trial court properly denied defendants' motion for a mistrial.

■■ Defendants contend, however, that the jurors' statements that the theft did not influence them in reaching the verdict should not have been admitted. Citing *People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656, they argue that a juror's statement may not be used to impeach the method or process by which the jury reached its verdict. Although we agree that this is an accurate statement of the law, we do not believe it is applicable here. The statements of the jurors here were used to support, rather than to impeach, the verdict. It is clear that a juror's testimony may be received to support the verdict. (*Smith v. Illinois Valley Ice Cream Co.* (1959), 20 Ill. App. 2d 312, 156 N.E.2d 361; *Loucks v. Pierce* (1950), 341 Ill. App. 253, 93 N.E.2d 372.) Accordingly, we find no merit in defendant's contention.

Defendants next contend that the trial court erred in refusing to allow the contents of a police report to be used to impeach the testimony of the police officer who prepared the report. Officer Seery apparently noted in his report concerning the homicide that John Lacy stated he had seen Melvin Ware and a man named Angelo running from the direction of the shooting. At trial, however, Seery testified that Lacy had stated that he saw three men, Ware, Angelo and a man whom he did not recognize. Seery informed the court, outside the presence of the jury, that his report

was incomplete since it did not include any reference by Lacy to a third man. The trial court refused to allow defendants to use the police report for the purpose of impeaching Seery.

■■ It is clear that evidence of a prior inconsistent statement by a witness is admissible to impeach the credibility of that witness. (*People v. Smith* (1945), 391 Ill. 172, 62 N.E.2d 669.) Evidence of such a statement is not admitted as proof of the matter asserted, but rather, to cast doubt upon the testimony of the witness at trial by showing an inconsistency. (*People v. Moses* (1957), 11 Ill. 2d 84, 142 N.E.2d 1.) In the present case the police report prepared by Seery was apparently inconsistent with his testimony at trial. Such inconsistency might have tended to lessen his credibility as a witness. We therefore believe the trial court erred in refusing to allow defendants to use the police report to impeach Seery. However, we hold this to be harmless error.

Defendants are guaranteed a fair trial and not one totally free from error. (*People v. Ashley* (1960), 18 Ill. 2d 272, 164 N.E.2d 70, *cert. denied* (1960), 363 U.S. 815, 4 L. Ed. 2d 1157, 80 S. Ct. 1255.) We will not reverse a conviction unless it appears that, as a result of the error, justice has been denied or that the jury verdict may have resulted from the error. (*People v. Cavanaugh* (1958), 13 Ill. 2d 491, 150 N.E.2d 592.) We have carefully reviewed the record before us and are convinced that the evidence establishing defendants' guilt was overwhelming. Indeed, defendants do not contest the sufficiency of the evidence against them. Witnesses Roosevelt Harris and Earl Lacy were each present when Milton Jackson was shot, and each clearly identified defendants as two of the attackers. Witness Will "Preacher" Ayers also identified Arnell Robinson as one of Jackson's attackers. Witness John Lacy identified both defendants as two of the three men he observed running from the direction of the shooting. Moreover, it does not appear that the inconsistency here was of a substantial or unexplainable nature. Considering the nature of the error alleged and the overwhelming evidence of defendants' guilt, we believe the error was certainly harmless beyond a reasonable doubt. We are convinced that the error did not contribute to the jury's determination of guilt.

Defendants finally contend that the sentences imposed by the trial court are excessive. Arnell Robinson received a sentence of 20 to 40 years while Angelo Robinson received a sentence of 40 to 120 years.

Although Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)) allows a reviewing court to reduce punishments, the imposition of sentence by the trial court is a matter of judicial discretion, and, absent an abuse of that discretion, the sentence will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A determination of the proper sentence depends upon such factors as

defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.) In considering whether the trial court abused its discretion in imposing sentence, we note that the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11.

■ The record before us does not indicate an abuse of discretion by the trial court. The evidence indicates that defendants were both active participants in a criminal attack upon Milton Jackson and that this attack resulted in Jackson's murder. Furthermore, the record indicates that Arnell had prior convictions for theft and resisting arrest while Angelo had prior convictions for criminal damage to property and possession of marijuana. Angelo had also, as a juvenile, been adjudicated delinquent for the offense of rape. Considering defendants' prior criminal records and the nature of the offense for which they were convicted here, we do not believe the trial court abused its discretion in imposing the sentences.

Contrary to defendants' contention, *People v. Horton* (1976), 43 Ill. App. 3d 150, 356 N.E.2d 1044, does not mandate that we reduce the sentences here. In *Horton* the defendant was 17 years of age at the time he committed the offense of murder and had no prior criminal record. The appellate court there reduced defendant's 25 to 50 year sentence to one of 14 to 25 years. Here, Arnell was 22 at the time of the offense while Angelo was 19. Each had a prior history of criminal activity. The present case is therefore significantly distinguishable from *Horton*.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.