THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE HUNLEY, Defendant-Appellant.

First District (2nd Division)   No. 1—87—1765

Opinion filed September 19, 1989.

26

Robert D. Nachman and Robert L. Graham, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Renee

Goldfarb, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People:

JUSTICE DiVITO delivered the opinion of the court:

Defendant Maurice Hunley was convicted by a jury of murder and residential burglary and sentenced to 40 years in the Illinois Department of Corrections. A previous trial ended in a mistrial caused by a hung jury.

On this appeal, defendant maintains that the trial court erred in denying his motion to quash his arrest and suppress evidence based on lack of probable cause; denying his motion to suppress palm print evidence; denying his motion to suppress his statements made to the police; denying his motion for a mistrial based on a burglary of deliberating jurors; limiting his presentation of evidence during cross-examination of an identification witness; limiting his presentation of evidence during his case in chief; allowing the jury to hear evidence of other crimes; and allowing certain remarks by the prosecutor during closing argument. We affirm.

On November 18, 1983, Lisa Tyson was fatally stabbed in her northside apartment in Chicago. Jamie Ardrey, Tyson's neighbor, testified that at 6:45 p.m. on that date, he heard screams coming from Tyson's apartment. He ran toward Tyson's apartment, and the door swung open, revealing a man standing inside holding a bloody kitchen paring knife. The man ran out of the apartment, dropped the knife on the hallway floor, and ran down the stairs. Ardrey entered the apartment and saw that Tyson had been stabbed. He was unable to call the police, because Tyson's telephone cord had been pulled from the wall. Ardrey telephoned the police from his own apartment and then returned to administer first aid.

Lawrence Van De Carr, driving a van stopped in traffic on Clark Street opposite Tyson's apartment building, saw a black male, later identified as defendant, run out of the building, jump over some fences and disappear down an alley. Van De Carr followed in his van, saw the man cross Lincoln Avenue at Webster and get into a cab, took the number of the cab, and reported the incident to the police.

The police, responding to a call, investigated. They recovered finger and palm prints from inside Tyson's apartment and from the inner door which led into the building. The police found no signs of forced entry. A key was required to gain entry into the building through the inner door. Despite an intensive police investigation, Tyson's murder remained unsolved for more than two years.

On January 6, 1986, defendant was processed on a burglary and unlawful use of weapons charge in connection with a burglary at Abbas Video on the 2300 block of North Clark Street. The arrest report in that case indicates that defendant was walking past Abbas Video when the owner told a Chicago police officer that defendant had recently changed the store's locks and had commented about the missing property prior to the burglary.

On January 14, 1986, Chicago police detective John Turney, assigned to investigate the burglary of Jane Boynton's apartment in the building where Lisa Tyson previously resided, noted that the lock to Boynton's apartment had not been forced open. Turney interviewed Boynton, examined her door, and concluded that there was no other possible means of entry into her apartment. Turney also interviewed Marge Cohen, the owner of the subject building. Cohen told Turney of another burglary in the building in November 1985 with no signs of forced entry and also mentioned the Tyson murder. Turney, aware of defendant's arrest in the Abbas Video burglary on the same block, mentioned defendant's name. Cohen told Turney that she knew defendant through his employment at Cook's Hardware located nearby and told Turney that defendant had done lock work in her building. After reviewing files on the burglaries in that building and files on other burglaries in the area, including the Tyson murder file, Turney and his partner, Detective Edward Louis, decided that defendant was a "good suspect" in the burglaries.

On January 21, 1988, at 11:30 p.m., Turney and Louis and two other police officers arrived at defendant's apartment in Cabrini Green, without an arrest warrant or a search warrant. According to both Turney and Louis, they knocked on defendant's door, identified themselves, and were invited inside the apartment by defendant. Turney and Louis told defendant they were there regarding a burglary investigation and asked defendant to accompany them to the police station. Defendant agreed and went into his bedroom to get dressed, accompanied by Turney and Louis, while the two other police officers remained in the living room. The police officers left defendant's apartment 15 minutes after they had arrived and escorted defendant to the Area 6 detective headquarters in their squad car. Defendant was not handcuffed or restrained in any way during this time.

Defendant's testimony described the events differently. According to defendant, he opened his front door about one foot after hearing a knock; the police officers then pushed the door open and entered without permission to come in; one of the police officers went into a closet in his son's room and looked into a wallet; another police offi-

cer went into a living room closet; and a third officer went into the kitchen and looked through a drawer. The police officers told him that he had to go to the police station; he was handcuffed in the hallway outside his apartment; and he was escorted by the police officers to the squad car.

Defendant arrived at Area 6 on January 22, 1986, at 12:10 a.m. He was put in an interrogation room and, for the first time, advised of his *Miranda* rights. According to Turney, defendant indicated that he understood his *Miranda* rights, did not ask to speak with a lawyer, and agreed to talk to the police officers. Defendant was then questioned about the burglaries in the building where Tyson had lived. He denied any involvement in the burglaries and denied ever having been in that building. Defendant was then questioned about the Tyson murder. He denied any involvement in the murder and, according to defendant, at this point stated that he wished to speak with his lawyer. According to the detectives, defendant did not ask to speak with his lawyer. This initial interrogation lasted approximately 30 to 45 minutes.

At 1 or 1:15 a.m., Turney spoke with Detectives James Gildea and Robert Elmore of Area 6 Violent Crimes. Turney then asked defendant if he "would be willing to be palm printed" and defendant stated that it would be "no problem." At 1:45 a.m., Turney and Louis escorted defendant to the print facilities in the basement. Defendant's palm print was taken and, at 2 a.m., defendant was escorted back to the interrogation room. Defendant testified, contrary to this version of the events, that he was beaten by Gildea and "told" by Turney that he was going to be palm printed.

Turney and Louis drove to 11th and State to have defendant's palm print compared with the palm prints found on the inner vestibule door of Tyson's apartment building on the night of her murder. Defendant's palm print matched one of those prints. At 3:30 a.m., Turney and Louis returned to Area 6 with the results. Defendant was not questioned between 2 a.m. and 4 a.m. Defendant testified that he was handcuffed to the retainer ring in the wall of the interrogation room during this time.

At 4 a.m. or 4:30 a.m., Gildea and Elmore entered the interrogation room, where defendant was advised of his *Miranda* rights. Defendant said he understood and did not invoke his right to counsel. He was again questioned about the murder. Defendant told the detectives that he remembered reading about the murder, but had no direct knowledge of it. Defendant related that he had worked at Cook's Hardware for seven years, where he repaired and installed locks. He

did not work in the building where Tyson had lived and was never inside that building. When told by Gildea that his palm matched a print found on the inner vestibule door on the night of the murder, defendant claimed that was a mistake because he had never been in the building.

At 5:30 a.m., defendant was brought down to the lockup and processed by Officer James Eiden. Defendant testified that he made two phone calls when he was left alone in the lockup area, one to his wife and one to his mother, asking that they contact his lawyer. However, Officer Eiden testified that defendant, who remained in the lockup until 8:30 a.m., was asked if he wanted to make a phone call, but made none.

At 8:30 a.m., Gildea and Detective Bernard Richter brought defendant to the interrogation room and handcuffed him to the retainer ring in the wall. According to Richter, defendant initiated a conversation by stating that he "was sorry he stabbed her" and that Tyson "surprised" him when "she walked into the apartment." Defendant was advised of his *Miranda* rights, which he said he understood. Gildea, Elmore, and Detective Thomas Johnson then entered the interrogation room, defendant was once again advised of his *Miranda* rights, and he again stated that he understood his rights.

According to the detectives present in the interrogation room, defendant, who remained handcuffed to the retainer ring, then gave a confession that lasted until 10 or 10:30 a.m. Defendant's statements were not tape-recorded and there was no court reporter present. Defendant stated that he had a drug habit in November 1983; on November 18, 1983, after he left work at Cook's Hardware, he noticed that the outer door to the building where Tyson had lived was ajar; it was his intention to commit a burglary inside that building to get money to support his drug habit; he went inside the building and went from door to door listening for signs that people were home; he heard nothing coming from Tyson's apartment, so he tried the door, found it unlocked, entered the apartment, and started to look around with a flashlight for small items to steal.

Defendant stated further that after a few minutes Tyson came home and asked him who he was; he told her "I'm nobody, I am leaving"; Tyson screamed, ran towards the kitchen and grabbed a paring knife from the counter; he grabbed Tyson and they struggled over the knife; he was cut on the arm, but managed to get the knife away from her and stab her twice in the chest. According to the coroner's report, Tyson had been stabbed eight times.

Defendant also stated that he ran out of the apartment; con-

fronted a white man outside Tyson's door; dropped the knife in the hallway; ran down the hallway, down the stairs, and out the front door; and, once outside, hopped a small fence, ran down a gangway, climbed another fence, and ran home to Cabrini Green. Defendant did not tell the detectives that he took a cab and he later denied ever taking a cab. Defendant positively identified photographs of Tyson's apartment, the building where Tyson had lived, the kitchen paring knife, and the outside area near where Tyson was killed.

Defendant testified that during this interview, which lasted roughly two hours, his coat was tied over his head and he was hit in the stomach and kicked in the ribs. The detectives denied that defendant was ever beaten, threatened, or otherwise physically or psychologically coerced.

At 12:50 p.m., Assistant State's Attorney Richard Mottweiler arrived at Area 6, spoke with Elmore and Richter, and then talked to defendant in the interrogation room. Mottweiler advised defendant of his *Miranda* rights, and defendant, not handcuffed at the time, stated he understood and was willing to talk. Defendant told Mottweiler that everything he told the detectives was true. Defendant related that he went to Tyson's apartment looking for money to support his drug habit; Tyson surprised him when she came home; Tyson went for a knife, which he grabbed from her; he stabbed Tyson and then fled from the apartment; and he confronted a white man in the hallway, dropped the knife, and ran out of the building. Defendant testified that the police threatened to tie his coat over his head and beat him if he did not make these statements to Mottweiler.

According to Mottweiler, defendant said he would give a statement to a court reporter. However, at approximately 1 p.m., defendant's attorney, Spike Proustos, arrived at Area 6 and was permitted to see defendant. After Proustos informed Mottweiler that defendant would not be giving a statement, Mottweiler went back into the interrogation room and noticed, for the first time, that defendant was bleeding over his left eyebrow. Mottweiler asked defendant why he had started to bleed and defendant stated that he had picked a scab over his eyebrow. Mottweiler then had a photograph of defendant's face taken by a court reporter.

Later in the evening, after Mottweiler's interview with defendant, Ardrey identified defendant in a lineup as the man he saw inside Tyson's apartment, but stated that he was "not 100% sure." On January 19, 1987, a lineup was conducted for Van De Carr, who identified defendant as the man he saw fleeing from the building where Tyson had lived.

Defendant's first jury trial ended in a mistrial when the jury divided 7 to 5 in favor of acquittal after two days of sequestered deliberations. At the end of defendant's second trial, the jury deliberated until 10 p.m. without reaching a verdict. After the foreman informed the court that the jury could not reach a verdict within one hour, the court ordered the jury sequestered in a hotel overnight. During the night, four jurors in two adjacent rooms, including the foreman, were burglarized. Apparently, the burglar entered the rooms with a pass key and stole several small items. The four burglarized jurors were interviewed by the police in the morning, and all 12 jurors spoke among themselves of the burglary. The jury resumed deliberations and reached a verdict of guilty within one hour. Four jurors had changed their votes from "not guilty" to "guilty." Two of these four, including the foreman, had been victims of the burglary.

The trial court conducted an *in camera* hearing to determine whether the burglary had affected the jury verdict. Each juror stated individually that the burglary did not affect their verdict, although some jurors expressed "concern" over the incident. The court then denied defendant's motion for mistrial based on the jury burglary and entered judgment on the verdict. The court denied defendant's post-trial motions and sentenced defendant to a term of 40 years in the Illinois Department of Corrections.

I

Defendant maintains that he was arrested without probable cause and his palm print, his confession, and the Ardrey and Van De Carr lineup identifications should have been suppressed as the fruit of his illegal arrest. Specifically, defendant maintains that the police in this case had only "mere suspicions," because they knew only that there had been two burglaries without forced entry in a building where defendant had done lock work. Defendant maintains further that the reason for his arrest was the Tyson murder, not the burglaries, and he was unlawfully detained for the purpose of investigating that crime.

Defendant argues that even if there was probable cause to arrest him, he was arrested in his home without a warrant in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. In this regard, defendant asserts that he was arrested by the time he left his apartment because Turney, Louis, and Officer Peter Magnine each testified that defendant was arrested at that time; Turney's police report indicates that defendant was arrested on January 21, 1986, at 23:55 hours; police conduct at his apartment estab-

lished that he was not free to leave; exigent circumstances were absent; and he did not consent to the police officers' entry into his apartment. Citing Chief Justice Clark's concurring opinion in *People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708, defendant maintains that, where a suspect merely opens his door after the police have knocked and identified themselves, a *Payton* violation nonetheless occurs if the suspect is arrested in his home without a warrant and there are no other indications that the suspect consented to the police entry.

At the suppression hearing prior to defendant's first trial, defendant argued that he was unlawfully arrested in his home and detained at the police station without probable cause, which required the suppression of his statements to the police, his palm print, and the Ardrey lineup identification. The trial court found that there was probable cause to bring defendant to the police station for questioning and that defendant went with the police officers voluntarily. We agree.

Probable cause determinations after hearings on motions to suppress evidence will not be disturbed on appeal unless they are against the manifest weight of the evidence. (*People v. Evans* (1988), 125 Ill. 2d 50, 71, 530 N.E.2d 1360.) Probable cause exists when the totality of facts and circumstances known to the police officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. (*Dunaway v. New York* (1979), 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9; *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475.) Commonsense considerations apply, and the calculation concerns "[t]he probability of criminal activity, rather than proof beyond a reasonable doubt." (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475; *People v. Tisler* (1984), 103 Ill. 2d 226, 236, 469 N.E.2d 147.) Whether the police officers' conduct is reasonable must be judged on the basis of their responsibility to prevent crime and apprehend criminals. *People v. Holloway* (1985), 131 Ill. App. 3d 290, 305, 475 N.E.2d 915.

In this case, after reviewing the files on the burglaries in the building where Tyson had lived, other burglaries in the area, and the Tyson murder, Turney and Louis decided that defendant was a "good suspect" in the burglaries because of his employment at a hardware store on the same block as the burglarized premises; his previous arrest for the burglary of Abbas Video, where he had done lock work and which was also located on the same block; the information provided to Turney that he had also done lock work in the building where

Tyson had lived; and the fact that the burglaries in that building, like the burglary of Abbas Video, involved unforced entries.

That this information was sufficient to establish probable cause to arrest defendant on burglary charges is supported by *People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475, and *People v. Davis* (1981), 98 Ill. App. 3d 461, 424 N.E.2d 630. In *Montgomery*, where the defendant lived on the murder victim's property and there were no signs of forced entry into the victim's apartment, the trial court's probable cause finding was upheld because the defendant "was part of a relatively small class of people who could have had the opportunity to commit the murders, and shortly after the murders defendant's physical appearance was both highly unusual and consistent with his having committed the crimes." (*People v. Montgomery* (1986), 112 Ill. 2d 517, 526, 494 N.E.2d 475.) Similarly, in *Davis*, the trial court's probable cause finding was upheld where there were no signs of forced entry into the victim's room; the defendant had access to the victim's room through his position as a hotel employee; and the police had determined that the defendant made two room service deliveries to the victim prior to her death.

As in *Montgomery* and *Davis*, the police officers in this case knew that defendant belonged to a "relatively small class of people" who could have committed the crime without leaving any signs of forced entry. Although in *Montgomery* the police knew in addition that the defendant's appearance was consistent with his having committed the crimes, and in *Davis* the police knew that the defendant had made room service deliveries to the victim's room, in this case the police also knew that defendant had been arrested in connection with the Abbas Video burglary on the 2300 block of North Clark. This additional information provided the basis upon which a reasonably prudent person might conclude that defendant committed the burglaries in the building where Tyson had lived.

*People v. Ellis* (1985), 131 Ill. App. 3d 639, 476 N.E.2d 22, relied on by defendant, does not compel a contrary conclusion. In that case, the appellate court stated that "the unproved accusation that defendant committed a different crime" did not establish probable cause and noted that, although there were no signs of forced entry, other family members had access to the house and the house could also have been entered through an open door or window. In contrast, here the "different crime" was more than a friend's "unproved accusation." Turney knew that defendant had been arrested in the Abbas Video burglary; the Abbas Video burglary involved an unforced entry; defendant had access to keys to the store; and a shotgun stolen from

the store had been found in defendant's possession. Unlike *Ellis*, the police in this case plainly had prior dealings with defendant in connection with a similar crime. (See *People v. Goins* (1987), 161 Ill. App. 3d 541, 546, 515 N.E.2d 195.) Accordingly, we do not find the trial court's probable cause finding in this case to be against the manifest weight of the evidence.

■ We also do not find the trial court's determination, that defendant accompanied the police voluntarily, to be against the manifest weight of the evidence. The trial court determined that defendant at no time refused to go to the police station. Turney testified at the suppression hearing that he told defendant they were at his apartment regarding a burglary investigation and asked defendant if he would accompany them to the police station. Defendant agreed to go with them to the police station for questioning, was not handcuffed or restrained in any way during this time, and was not advised of his *Miranda* rights at his apartment or on the way to the police station. Indeed, the only evidence that defendant did not leave voluntarily was his own testimony that he believed he had no choice but to go and his testimony, contrary to the testimony of the police officers, that he was handcuffed in the hallway outside his apartment. However, the trial court did not find defendant's testimony credible. Based on the testimony of the police officers in this case, we are satisfied that the trial court's finding is not against the manifest weight of the evidence.

■ It follows that defendant was not arrested in his apartment and there was no *Payton* violation in this case. Even if defendant had been arrested in his home, *Payton* is inapplicable, because the evidence established that defendant consented to the entry by the police officers by opening his door after the officers identified themselves and inviting the officers inside. Chief Justice Clark's concurring opinion in *People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708, relied on by defendant, is inapposite because the police officers in that case did not ask the defendant if they could come in and talk to him and there was no other evidence that the defendant consented to an entry.

II

Defendant maintains next that his palm print was taken involuntarily. Defendant contends that he was coerced into giving his palm print because he was escorted by police officers down to the lockup area to be printed; escorted back to the interrogation room; and then handcuffed to a retainer ring in the wall of the interrogation room. Defendant argues that the police would not have had to escort him

through the palm printing process, or handcuff him to the retainer ring, if he had consented to having his palm print taken. Defendant also maintains that his palm print was taken as part of the Tyson murder investigation and that the police did not have probable cause to detain him for the purpose of investigating that crime.

■ We hold that the trial court's finding that defendant's palm print was given voluntarily is not against the manifest weight of the evidence. Initially, we note that escorting a defendant to and from the lockup area for printing is not a coercive police tactic. We note further that Turney testified that he asked defendant if he "would be willing to be palm printed" and that defendant stated it would be "no problem." Although defendant testified that he was punched in the stomach and told he was going to have his palm print taken, the trial court did not find his testimony credible.

■ Finally, we reject defendant's argument that his palm print was illegally obtained because his arrest on burglary charges was pretextual and the police lacked probable cause to detain him for the purpose of investigating the Tyson murder. In *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, the Illinois Supreme Court held that it was not improper to question the defendant about a murder if there was probable cause to support his arrest on an unrelated charge, and nothing in the record suggests that the arrest was made other than in the ordinary course of an investigation. Because nothing in the record in this case suggests that defendant was detained for questioning on burglary charges as a subterfuge for investigation of the Tyson murder, under *Evans* the police did not need probable cause to arrest defendant for Tyson's murder before detaining him for purposes of investigating that crime.

### III

Defendant contends next that his statements to the police were the product of unlawful coercion because he was physically beaten; repeatedly interrogated; handcuffed periodically and locked behind bars; denied access to food and sleep; denied access to his lawyer; and did not sign a written waiver of his *Miranda* rights. Defendant contends further that his confession should have been suppressed because his arrest on burglary charges was pretextual and he was unlawfully detained for the purpose of the Tyson murder investigation.

■ A confession is given voluntarily if, under the totality of circumstances, the statement was made freely and without compulsion or inducement of any sort, and the defendant's will was not overcome at the time he confessed. (*People v. Martin* (1984), 102 Ill. 2d 412,

427, 446 N.E.2d 228; *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) Consideration must be given to both the characteristics of the accused and the details of the interrogation. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) A trial court's finding that a statement was voluntary will not be disturbed on appeal unless it is against the manifest weight of the evidence. *People v. Evans* (1988), 125 Ill. 2d 50, 76-77, 530 N.E.2d 1360.

██ In this case, the record reflects that defendant was 23 years old at the time he confessed; had prior experience with the criminal justice system; did not have any mental disabilities; was advised of his *Miranda* rights on five separate occasions and indicated on each occasion that he understood his rights; and had the opportunity to rest or sleep when he was in the lockup between 5:30 and 8:30 a.m. Furthermore, Assistant State's Attorney Mottweiler gave highly credible testimony regarding the substance of the confession; defendant's failure to request an attorney; and the absence of any sign that defendant had been beaten, except for a cut over defendant's eyebrow which Mottweiler noticed only after defendant met with his own attorney. The police officers also testified that defendant was not physically beaten or psychologically coerced and did not ask for a lawyer. The trial court heard this testimony and found that it was credible. Accordingly, based on our review of the record, we do not find the trial court's ruling on the voluntariness of defendant's confession to be against the manifest weight of the evidence.

Finally, as discussed above, because it was not improper for the police to investigate the Tyson murder, we reject defendant's argument that his confession, like his palm print, was illegally obtained because his arrest on burglary charges was pretextual.

## IV

Defendant maintains next that the Ardrey and Van De Carr lineup identifications should have been suppressed as the product of his unlawful detention. Defendant argues that, as in *People v. Spicer* (1987), 163 Ill. App. 3d 81, 516 N.E.2d 491, the Ardrey lineup conducted the day after his purportedly illegal arrest should have been suppressed as the fruit of the illegality, because there were no intervening circumstances to purge the identification of the primary taint. Defendant argues that the Van De Carr identification should have also been suppressed because he was held in custody on the strength of the illegally obtained palm print, confession, and Ardrey identification.

██ However, defendant's reliance on *People v. Spicer* is mis-

placed. In that case, the court stated that evidence of a lineup identification on the day following an unlawful arrest must be suppressed as the fruit of the illegality, where there are no intervening circumstances purging the evidence of the primary taint. In this case, by contrast, there was no primary illegality because defendant voluntarily accompanied the police to the station for questioning; the police had probable cause, in any event, to arrest defendant on burglary charges; and defendant was lawfully detained for the purpose of investigating the Tyson murder. Accordingly, there is no merit to defendant's contention that the Ardrey identification evidence should have been suppressed. Because defendant's palm print, defendant's confession, and the Ardrey identification were legally obtained, defendant's argument with respect to the Van De Carr identification evidence is also without merit.

## V

Defendant maintains that the jury burglary created such a probability of prejudice to his case that the verdict reached was inherently lacking in due process and violative of his right to a fair and impartial jury, because the burglary "powerfully reinforced" the theme of the State's closing argument "that everyone expects to be able to feel safe in their own home." Defendant relies on a jury expert's conclusion that the burglary "seriously reduced the probabilities that the jury would render a verdict other than guilty" and argues that the jurors' own views on whether the burglary influenced their verdict should not be dispositive because jurors rarely admit their own bias. However, we hold that the inquiry conducted by the trial court adequately safeguarded defendant's rights to a fair trial and an impartial jury.

The decision to grant or deny a motion for a mistrial is within the sound discretion of the trial court and a ruling denying the motion is proper absent a demonstration of prejudice to the defendant. (*People v. Staten* (1986), 143 Ill. App. 3d 1039, 1056, 493 N.E.2d 1157; *People v. Robinson* (1979), 68 Ill. App. 3d 747, 386 N.E.2d 559.) Whether a mistrial is appropriate where the question of juror bias or prejudice arises should not be decided solely on the basis of verbal assurances of the jurors, but such assurances are nevertheless an important consideration. *People v. Staten* (1986), 143 Ill. App. 3d 1039, 1057, 493 N.E.2d 1157.

In this case, the conclusion that the inquiry conducted by the trial court adequately safeguarded defendant's rights to a fair trial and an impartial jury is supported by *People v. Robinson* (1979), 68 Ill. App.

3d 747, 386 N.E.2d 559, and *People v. Novak* (1981), 94 Ill. App. 3d 1024, 419 N.E.2d 393. In *Robinson*, the defendants were convicted of murder after one of the jurors had her purse stolen while the jury was sequestered in a motel. The trial court inquired of each juror whether the incident had affected his verdict. Each juror stated that the incident had no effect on his ability to be fair and impartial. The trial court denied the defendants' motion for a mistrial and the appellate court affirmed, stating that the trial court's inquiry properly safeguarded the defendants' rights to a fair trial. Similarly, in *Novak*, one juror was robbed before deliberations began at the defendant's murder trial. The trial court asked the jury if the robbery of the juror would affect their ability to be fair and impartial. After receiving no reply, the trial court denied defendant's motion for a mistrial. The defendant was convicted and his conviction was affirmed by the appellate court.

As in *Novak* and *Robinson*, the inquiry conducted by the trial court in this case was sufficient to safeguard defendant's rights to a fair trial and an impartial jury. Before ruling on defendant's motion for a mistrial, the trial court questioned the four jurors who were in favor of acquittal before the jury was sequestered. The two who were victims of the burglary at the motel indicated that the incident did not affect their ability to reach a fair and impartial verdict or give defendant a fair trial. The other two jurors indicated that they would have reached the same verdict had the burglary not occurred.

Significantly, in denying defendant's motion, the trial court did not rely solely on these assurances. Rather, the court noted that the jurors were deliberating in good faith and that the four holdouts, "basically, wanted to be convinced beyond any doubt the fact that [defendant] was guilty of the charge." The court also noted that the strong evidence of defendant's guilt at trial decreased the likelihood that the guilty verdict was influenced by the burglary. Finally, the trial court gave consideration to the affidavit of defendant's jury expert, but did not find it persuasive. Accordingly, based on our review of the record, we find that the trial court's denial of defendant's motion for a mistrial was not an abuse of discretion.

## VI

Defendant maintains that the trial court erred in precluding him from informing the jury that a January 1986 Chicago Tribune article, that Lawrence Van De Carr might have seen prior to his lineup identification, contained a photograph of defendant. Van De Carr had testified that he read the article in the Tribune about defendant's arrest,

but could not recall whether that article contained a photograph of defendant. Defendant argues that if the jury had been informed that the article contained a photograph of defendant, it might have concluded that Van De Carr's identification stemmed from his examination of the photograph rather than his observations in November 1983.

■■■ Defense counsel should be given wide latitude on cross-examination of identification witnesses. (*People v. Morris* (1964), 30 Ill. 2d 406, 197 N.E.2d 433.) Nevertheless, the scope of cross-examination is a determination which rests largely in the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal unless there has been an abuse of discretion resulting in manifest prejudice to the accused. *People v. Gorney* (1985), 107 Ill. 2d 53, 59, 481 N.E.2d 673; *People v. Kline* (1982), 92 Ill. 2d 490, 504, 442 N.E.2d 154.

■■■ In this case, the trial court's decision to preclude defendant from showing the jury that the Tribune article contained a photograph of defendant was not an abuse of discretion resulting in manifest prejudice to defendant. *People v. Lewis* (1974), 18 Ill. App. 3d 281, 309 N.E.2d 784, relied on by defendant, is inapposite. In that case, the court reversed the defendant's conviction because the trial court excluded any questioning regarding photographs of the defendant that the witness might have seen before identifying the defendant. In this case, by contrast, Van De Carr had already testified that he read the article and did not recall whether it contained a photograph of defendant. Because Van De Carr was asked whether he remembered the photograph, the jury could have reasonably concluded that the Tribune article did in fact contain a photograph of defendant. In any event, showing the jury that the article contained a photograph would not have established that Van De Carr either saw the photograph or relied on it in making his lineup identification.

### VII

Defendant maintains that the trial court erroneously excluded proffered testimony that he had done lock work in the building where Tyson had lived five or six times per month from September 1983 through January 1984, and had changed Linda Knight's lock in that building in October 1984. Defendant claims that this evidence was critical to his contention that his palm print was left on the inner vestibule door because he had been working in the building. Defendant also claims that the State took unfair advantage of the trial court's exclusion of this evidence by stating in its rebuttal closing argument that there was no evidence that defendant did any work in the building or otherwise had access to the building.

██ We hold that the trial court did not abuse its discretion in excluding the proffered testimony. A trial court may reject proffered testimony on grounds of irrelevancy if it has little probative value due to remoteness, uncertainty, or its possibly unfair prejudicial nature. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696; *People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304.) The admission of evidence is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent a clear showing of abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

In this case, the trial court properly limited evidence regarding defendant's work in the building where Tyson lived to the few months preceding the Tyson murder. Evidence that defendant was in the building after November 18, 1983, plainly had no probative value on the issue of whether defendant left his palm print on the inner vestibule door on the night of November 18, 1983. Accordingly, the proffered testimony that defendant changed the lock in Linda Knight's apartment in October 1984 was properly excluded. Because Gabriella Peri could not recall a specific date before November 18, 1983, when she saw defendant in the building, her proffered testimony was also properly excluded.

## VIII

Defendant contends next that the trial court erred in denying his motion *in limine* with respect to alleged burglaries in the building where Tyson lived and improperly permitted the State to allude to the police investigation of burglaries which led them to defendant's apartment and to ask defendant on cross-examination if he knew whether the police had suspected him of burglary.

██ However, evidence of other crimes is admissible for the purpose of explaining the circumstances or context of a defendant's arrest. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) In *People v. Goka* (1983), 119 Ill. App. 3d 1024, 458 N.E.2d 26, and *People v. Young* (1983), 118 Ill. App. 3d 803, 455 N.E.2d 845, for example, the courts upheld the trial courts' rulings permitting limited testimony regarding other crimes that explained the circumstances which led to the defendants' arrests. In this case, as well, we uphold the trial court's ruling on defendant's motion *in limine* regarding other burglaries, because the court did exclude specific references to evidence of other burglaries and merely allowed a reference to the burglary investigation to clarify the circumstances leading to defendant's arrest.

## IX

Finally, defendant maintains that the State committed reversible error in its rebuttal closing argument by improperly attacking the credibility of defense counsel; misstating the burden of proof by telling the jury that it could acquit defendant only if it found that all the State's witnesses were lying; giving improper personal views of the evidence regarding whether Tyson kept her door locked; improperly putting the credibility of the State's Attorney's office before the jury by arguing that the jury could not acquit defendant without "convicting" the prosecutors of lying; and, finally, mischaracterizing the elements of murder by omitting the element of intent.

Generally, prosecutors are permitted wide latitude in their closing arguments, although their comments must be based on the evidence or on reasonable inferences drawn therefrom. (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 473 N.E.2d 506.) Improper comments during closing argument do not warrant reversal unless the argument as a whole was so seriously prejudicial that it deprived the defendant of a fair trial. *People v. Cunningham*, 130 Ill. App. at 266, 473 N.E.2d 506.

In this case, the prosecutor's attack on defense counsel's credibility was not sufficiently prejudicial to warrant reversal. Defense counsel cannot invite or provoke a response and then claim that defendant was prejudiced thereby. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688.) In this case, defense counsel argued that Richard Fields, a cab driver who testified at trial, "was a witness" on the night of the murder who "must have seen the offender." In response to these statements by defense counsel, the prosecutor stated "that is an absolute lie. There is no Richard Fields that saw this murder. Never was." Although we do not condone the prosecutor's insinuation that defense counsel was lying, we do not find her invited response sufficiently prejudicial to warrant reversal.

A prosecutor's comment that in order to acquit the defendant, the jurors would have to believe that every State's witness was lying, does not automatically warrant reversal. (*People v. Alexander* (1984), 127 Ill. App. 3d 1007, 470 N.E.2d 1071.) In *People v. Smith* (1987), 158 Ill. App. 3d 595, 511 N.E.2d 770, the court held that a similar statement by the prosecutor was not reversible error, because it was, in effect, a true statement. In this case, the prosecutor's statement to the jury, that in order to acquit defendant they would have to find that every State's witness was lying was also not reversible error, because defendant's testimony did, in fact, directly contradict the testimony of the State's key witnesses.

We also do not find any prejudicial error in the prosecutor's remark that she was "sure Lisa Tyson kept her door locked." Although it is generally improper for prosecutors to state their opinions during closing argument, there is an exception for comments based on the evidence. (*People v. Johnson* (1986), 114 Ill. 2d 170, 198, 499 N.E.2d 1355.) In this case, the prosecutor's comment was a reasonable inference drawn from the evidence adduced at trial and, accordingly, not an improper expression of personal opinion.

Nor are we persuaded by defendant's contention that the prosecutor improperly put her own integrity and the integrity of the State's Attorney's Office before the jury. Reversible error has been found in cases where prosecutors have commented on their own belief in the credibility of witnesses, or on their belief that charges would not have been brought against the defendant unless the prosecutors believed the defendant was guilty. (See *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368; *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217.) No such comments were made in this case. Rather, the prosecutor remarked only that the assistant State's Attorneys would not "get a raise" or "become partners in a big law firm" if they won the case and would not be a "part of a conspiracy" over "some murder case" that was "like lots of other[s]." While we do not condone such remarks, we do not find that they resulted in sufficient prejudice in this case to have denied defendant a fair trial.

■ Finally, we do not find reversible error in the prosecutor's omission of the element of intent in her characterization of the crime of murder. The prosecutor stated: "[W]e have to prove the person committed the act which caused the victim's death, and we have to prove who did it." The prosecutor then stated: "You're not going to get one single instruction from Judge Bailey—[,]" at which point defense counsel objected and the court stated that it would instruct the jury. The jury was, indeed, given an instruction on the elements of murder which included the element of intent. Accordingly, based on our review of the record, we conclude that the prosecutor's characterization of the crime of murder did not result in substantial prejudice to defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.