THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD SMITH, Defendant-Appellant.

First District (5th Division)   No. 1—86—3240

Opinion filed June 8, 1990.

840

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Jane E. Loeb, and William Marback, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Edward Smith (defendant) and Sandra Gicla (codefendant) were indicted on 159 counts, charging them with criminal sexual assault, aggravated criminal sexual assault, kidnapping, aggravated kidnapping, aggravated battery, unlawful restraint, armed robbery and armed violence. They were tried jointly before a jury on 10 of these counts, including seven counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14), one count of aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2), one count of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), and one count of armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2) and were both found guilty on these charges. Defendant was sentenced to the maximum extended term of 60 years' imprisonment for his aggravated criminal sexual assault conviction and a concurrent term of 30 years' imprisonment for his armed robbery conviction.

Codefendant Gicla was sentenced to 24 years' imprisonment for her aggravated criminal sexual assault conviction and a concurrent term of 10 years' imprisonment for her armed robbery conviction. The trial court entered no sentence on the armed violence and aggravated kidnapping convictions, having found them to have merged.

Defendant Smith now appeals from his convictions and sentence. Codefendant Gicla takes no part in this appeal.

The facts of the case are as follows.

Defendant and codefendant were arrested at about 7:30 p.m. on March 4, 1985, when the car they were driving was stopped by police because it was a stolen vehicle. Because they fit a general description of alleged perpetrators who were wanted in connection with two sexual assaults that occurred in September 1984, their arrest was made known to Sergeant Thomas O'Connor, who was involved in the ongoing investigation of the sex crimes. O'Connor arrived at District 8 police station, where defendant and codefendant were being held, at about 1 a.m. on March 5, 1985. He met briefly with defendant at this time, although their conversation concerned only the stolen motor vehicle charge.

At about 1 p.m. on March 5, 1985, both defendant and codefendant were transferred to Area 3 Violent Crimes Headquarters, located at 3900 South California Avenue in Chicago. There, at about 1:30 p.m., O'Connor met with defendant briefly and, after advising defendant of his rights under *Miranda*, notified him that he was a suspect in connection with two sexual assaults and that he would be placed in a lineup later that day. At about 7 p.m. that evening lineups were conducted and viewed by the two sexual assault victims. Both victims positively identified defendant, as well as codefendant, who participated in another lineup at about the same time.

After the lineups, at about 8:30 p.m., O'Connor met with defendant once again. He reapprised defendant of his rights and then informed him that he had been positively identified in the lineup. He also notified defendant that an assistant State's Attorney had been summoned and that charges would, in all probability, be filed upon his arrival. Following this, defendant made inculpatory statements, admitting involvement in the sexual assaults. He then asked to speak with codefendant, and when allowed to do so, encouraged her to admit her involvement in the crimes. Codefendant then made admissions consistent with defendants statements.

Later that same night, at about 10 p.m., Assistant State's Attorney Babbitt arrived at the station. Defendant and codefendant repeated their admissions to Babbitt after he, too, advised them of their rights. However, they refused to sign the statements which were reduced to writing by Babbitt.

Prior to trial, defendant made a motion to suppress his post-arrest statements and an evidentiary hearing was held. At this hearing defendant attempted to show that his statements had been made in-

voluntarily and after he had requested an attorney. After hearing evidence the trial court denied defendant's motion and found his statements to be admissible.

The case proceeded to trial, at which time J.S., the victim of a sexual assault, testified that at about 7:30 p.m. on September 18, 1984, she left her Chicago apartment to walk to a bar located two blocks away so that she could sign up for a women's pool league. As she walked down 43rd Street near the intersection of California, she noticed a man walking in a hurried fashion, coming from an alleyway just ahead of her. When she got to this alleyway, she saw that a white, compact-sized car was parked there with its motor running. A woman was standing near the rear passenger side of the vehicle. The woman approached her and asked if she would check to see if the directional signals on the vehicle operated properly. Initially J.S. agreed, but she became suspicious when the woman did not immediately move toward the car and appeared to be looking over J.S.'s shoulder. For this reason J.S. turned to leave and, as she did so, she saw that the man, whom she had seen earlier crossing the street from the alleyway, was "charging" toward her. J.S. tried to run but the man grabbed her shoulders and propelled her into the alleyway, pinned her against the wall of a building, and held a knife to her throat. J.S. identified the man as defendant and the woman as codefendant Gicla.

J.S. threw her purse to the ground and told defendant to take it. He replied that he didn't want her money, he wanted her. Defendant threatened to kill J.S. if she screamed, but encouraged her to scream, stating that he would enjoy cutting her into "teeny pieces." He also reprimanded her for looking at him and then tore her eyeglasses off. Codefendant then held the front seat of the car forward while defendant forced J.S. into the back seat of the car. Once in the back seat, J.S. was blindfolded, all her clothing removed and her hands tied behind her back with her bra.

Although blindfolded, J.S. could discern shapes and so she was aware that defendant was driving the vehicle. She also recalled that they made several stops, the first one at what seemed to be a liquor store. Codefendant got out and soon after returned with something in a paper bag. While codefendant was inside the store defendant "played" with the knife on J.S.'s bare back as she lay nude on the back seat of the car. After codefendant returned, they drove on. Codefendant then rummaged through J.S.'s purse while defendant asked J.S. several questions, including her name and whether she had a boyfriend.

The second stop seemed to be inside an enclosed area, perhaps a garage. Codefendant stayed with J.S. while defendant exited the car. J.S. asked if they intended to kill her and codefendant told her to "just do what he says because he gets really crazy." At the third stop she was informed that they were switching vehicles. She was then taken out of the car she had been in and moved to the backseat of a different, larger automobile with velour seats.

From the sounds she heard, J.S. believed the next stop was at a park. Defendant stopped the vehicle and both he and codefendant got into the backseat with her. Defendant opened a bottle of gin, took a drink and then passed the bottle to codefendant, who also took a drink. Defendant once again "played" with his knife on J.S.'s body and then forced her to perform fellatio on him and cunnilingus on codefendant. After this defendant poured the remainder of the bottle of gin down J.S.'s throat, threatening to kill her if she spilled "one drop." Although J.S. could recall that they drove for sometime after that, she could remember nothing more of that evening.

J.S. awoke the next day on the floor of an unfamiliar apartment. She was still blindfolded and both her arms and legs were tied. Her arms were numb, her lips felt puffy and the inside of her mouth felt scratched and cut. One of her arms had a cut on it and both her vagina and rectum were "extremely sore." When defendant noticed that she had awakened he came to her and, once again, ran his knife across her body. J.S. asked him to untie her arms and legs and he finally did so. Defendant told her that codefendant was not present and then forced her to have vaginal intercourse with him.

The telephone rang and following a conversation over the telephone, defendant told J.S. that he needed some information from her. In a subsequent telephone call, defendant relayed this information, stating "Here [are] the stats on the bitch, check her out." Defendant insinuated that codefendant worked for, or had contacts in, the police department and that they would know if she contacted the police if she was released.

When codefendant returned to the apartment, J.S. was forced to kneel on the floor and have vaginal intercourse in this position. She was told that two other men were having intercourse with her, but J.S. believed, upon reflection, that this was not true and that it was, in fact, defendant who was performing the sexual acts upon her. She was also forced to perform oral sex on both defendant and codefendant at this time. Later, codefendant and defendant went through J.S.'s purse and asked her about each name in her address book.

Codefendant left the apartment again, at defendant's direction, to

purchase more liquor and some food. In her absence defendant watched television and drank alcohol, although he also had J.S. perform fellatio on him intermittently. When codefendant returned to the apartment again, J.S. was forced to take a bath with defendant, was given a douche by codefendant, and an enema by defendant. She was given a "sleazy nightie," a garter belt and nylons to wear and then lead to believe that pictures were being taken of her. Additional sex acts were then performed on her, including the insertion of objects into her vagina and rectum. During this time codefendant placed her hand over J.S.'s mouth and put her head into a pillow to muffle her screams.

Finally, J.S. was given some clothes and her purse, which was later found to be missing the $28 that had been inside, and told that she was going home. Defendant thanked J.S. for helping them with codefendant's "fantasy." Then they walked J.S. outside and put her inside the second, larger vehicle that she had ridden in the night before. J.S. was driven to an alleyway near her own apartment. Defendant indicated that he was holding a gun to her head and then walked her to a fenced-in yard. He threatened to kill J.S. if she didn't "run like a motherfucker." Then he and codefendant drove away.

J.S. estimated that she was released at about 9:30 p.m. on September 19, 1984. She "barely walked" to her apartment and, once there, saw for the first time her physical injuries. She noted that her face and body were bruised and cut, her eyes were blackened, her teeth were chipped and she had a broken nose. She was also extremely stiff and sore and had lost sensation in her thumbs due to her arms being tied for so long.

J.S. also noticed that inside her apartment there was a policemen's flashlight and a missing person's report directing her to call the police station when she returned home. She did not call, however, out of fear. But later that evening, when a police officer came to J.S.'s apartment to retrieve the flashlight that had been left there, he convinced J.S. to make a report. Then other officers were called and J.S. was taken to the hospital.

J.S. further testified that she viewed a lineup on October 14, 1984, and a photograph of another lineup on November 7, 1984, but her attackers were not among either of these groups. However, on March 5, 1985, she viewed two lineups, one of a group of men and one of a group of women, and positively identified defendant and codefendant as her attackers at that time.

In addition to the testimony of J.S., the State presented the testimony of S.W., who had been abducted and sexually assaulted on Sep-

tember 15, 1984. She, too, had positively identified defendant and co-defendant as her attackers from the March 5, 1985, lineup and her testimony revealed that her abduction and treatment was similar to J.S.'s abduction and treatment in a number of ways. Furthermore, Chicago police officer Thomas O'Connor testified that subsequent to their arrest, defendant and codefendant made inculpatory statements, admitting to their involvement in the charged offenses.

Based on this and other evidence adduced at trial, the jury found both defendant and codefendant guilty as charged and they were later sentenced on their convictions. Defendant now brings this appeal in which he raises the following issues: (1) whether the trial court erred in admitting his statements into evidence when they were not voluntarily made; (2) whether the State failed to meet its burden of proof that he knowingly and voluntarily waived his right to remain silent and have the assistance of counsel; (3) whether it was error to have admitted into evidence testimony that his arrest resulted from his commission of the offense of possession of a stolen motor vehicle; (4) whether improper hearsay was admitted at trial; (5) whether prosecutorial misconduct denied him a fair trial; and (6) whether his extended-term sentence was improper and excessive. While we shall address each issue below, we conclude that defendant's conviction and sentence must stand.

■ Defendant's first two issues concern the admission of his post-arrest statements. The admissibility of an accused's confession, obtained during a custodial interrogation, depends on whether the State has proven, by a preponderance of the evidence, that defendant knowingly, intelligently and voluntarily waived his privilege against self-incrimination and his right to assistance of counsel. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628; *People v. Reid* (1990), 136 Ill. 2d 27; *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508; *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181.) Once the State presents a *prima facie* case, *i.e.*, evidence that defendant was properly admonished and that after being admonished, he waived his rights by making a statement, then the burden shifts to defendant to show that his waiver was not knowing, intelligent and voluntary. (*People v. Reid*, 136 Ill. 2d 27; *People v. Cozzi* (1981), 93 Ill. App. 3d 94, 98, 416 N.E.2d 1192.) To determine whether the State has met its burden, a trial court must consider the totality of the circumstances. (*People v. Reid*, 136 Ill. 2d 27; *People v. Kincaid*, 87 Ill. 2d 107, 429 N.E.2d 508.) This should include an evaluation of the accused's age, experience, education, background, and intelligence, as well as the conditions and circumstances

surrounding the interrogation when the waiver took place. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) A reviewing court is limited to determining whether the lower court's finding that the accused effectively waived his rights was against the manifest weight of the evidence. *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228; *People v. Brownell*, 79 Ill. 2d 508, 404 N.E.2d 181.

In the present case defendant raises two bases for his contention that the trial court erred by admitting his admissions into evidence: (1) that the State failed to prove that he waived his right to remain silent, and (2) that the State failed to prove that he waived his right to assistance of counsel.

In the first instance, defendant argues that the record shows that his inculpatory statements were made after he indicated that he wished to remain silent and that his wishes were not "scrupulously honored." (*Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321; *People v. R.C.* (1985), 108 Ill. 2d 349, 483 N.E.2d 1241.) Defendant further argues that his statements were a product of compulsion and, as such, obtained in violation of his constitutional rights, so that the trial court erred by ruling that they were made voluntarily. With regard to the second issue, defendant contends that he presented the trial court with evidence that he had requested the assistance of counsel prior to questioning but that the trial court resolved the issue in the State's favor after impermissibly shifting the burden of proof to him. Defendant argues that the State's evidence was insufficient to show that he waived his right to counsel.

The State contends, however, that the record shows that defendant never expressed a desire to remain silent nor did he request the presence of counsel and, thus, defendant never invoked his constitutional rights in this regard. Furthermore, the State argues that, if this court were to find that defendant had expressed a desire to remain silent prior to his questioning by police, his subsequent statement to the assistant State's Attorney was voluntarily made and sufficiently attenuated to have been purged of any taint from his previous involuntary statement to the police. Additionally, the State contends that the admission of defendant's statements, if error, was harmless beyond a reasonable doubt due to the overwhelming evidence against him.

Based on the arguments made we must first determine whether defendant invoked his right to remain silent and/or requested the assistance of counsel. Only then may we determine whether any subsequent waiver occurred and whether it was made knowingly, intelligently, and voluntarily.

Because defendant did not testify either at the suppression hearing or at trial, to support his claim that his right to remain silent was not "scrupulously honored," defendant relies upon the testimony of Sergeant Thomas O'Connor, who conducted the custodial interrogation of defendant. But at the evidentiary hearing O'Connor testified that he advised defendant of his *Miranda* rights prior to questioning and that defendant indicated that he understood these rights and wished to speak with the police without having an attorney present. Even O'Connor's testimony on cross-examination did not establish that defendant asserted his right to remain silent, as can be seen from the following colloquy:

"Q. And when you went in alone [to begin questioning], what was the first thing you did?

A. Informed him of his *Miranda* warnings.

Q. And after that was done, what happened?

A. Also informed him he was identified in the line-ups.

Q. And what happened next?

A. Began questioning him in regards to his participation in these events, these crimes.

Q. And what happened?

A. We sparred for a while, yes and no.

Q. Let me interrupt. When you say 'sparred' what happened, what was said?

\* \* \*

A. I had asked direct question [*sic*] 'Did you in fact commit these crimes,' or something. And he would smile and shake his head no. Like at this point he was not ready to admit anything, his participation. We continued talking. We talked about the crime. We talked baseball, we talked about a couple things.

\* \* \*

Q. So he would say 'No, I didn't do the crime,' and you would say what when he did that?

A. I would inform of the fact there is evidence showing that he did. And he would say, 'Well, I'll have to live with it.' I said 'Yes, you will.' And then just out of the blue he decided to give a statement."

■ We find nothing in this testimony to indicate that defendant invoked his right to remain silent. Rather, it seems to indicate that, although defendant agreed to speak with the officer, he maintained his innocence for a period of time before making an admission.

Furthermore, although we may consider evidence presented at trial when reviewing whether a defendant's statements should have

been suppressed (see *People v. Caballero* (1984), 102 Ill. 2d 23, 37, 464 N.E.2d 223, 229), we find nothing in Sergeant O'Connor's trial testimony that convinces us that the trial court erred by admitting defendant's statements. At trial, O'Connor testified as follows:

"Q. This was right after you told him he had been identified in a line-up, is that correct?

A. That's right.

Q. After you read him his rights, did he tell you whether or not he wanted to talk to you at that point?

A. He denied it and said he would talk but he denied—.

Q. No my question right now is after you read him his rights, did he say, yes, I'll talk to you, or did he say, no I don't want to?

\* \* \*

A. After I read him his rights, he just began talking and said he wouldn't talk, but he talked, yes.

\* \* \*

Q. Can you tell us what you said to him after you advised him of his *Miranda* rights, after having already told him he had been identified in a lineup?

A. I asked if he wanted to tell us what occurred, about his participation in it. I also informed him that his friend, [codefendant], had been identified in the lineup also. Then we just talked about where he lived. We talked about baseball.

Q. Let me ask you this. You asked him if he wanted to tell you about what had happened. Did he say anything about what had happened?

\* \* \*

A. The best I can recall, he said, no, but smiling and shaking his head, yes, more or less. He said, no, but smiling."

Defendant points to this testimony as support for his claim on appeal that he made a clear and unequivocal invocation of his right to remain silent which was not honored. We do not attribute to this testimony the meaning that defendant now ascribes to it. In fact, from our review of the entire record, it seems clear to this court that defendant at no time made any indication that he did not wish to speak to the officer, only that he initially did not wish to admit any culpability for the crimes for which he had been identified. In context, it is clear that the "No" answer, cited above, was in response to whether defendant wished to tell the officers what occurred, thereby admitting his involvement in the crime. This is supported by O'Connor's trial testimony during cross-examination, wherein the following

conversation took place:

"Q. Right. You talked about some baseball, and you had a friendly conversation, and then he confessed to this crime, is that a correct summary of what you testified to?

A. I also told him that we had a good case against him, he was identified in a lineup. The state's attorney was on the way. That was part of our conversation.

Q. That was the first thing you said to him, that he had been identified in a lineup. He—he denied committing the crime, is that correct, and then you chatted with him, and then he confessed, is that correct?

A. Yes, sir, pretty much so."

We are aware of the United States Supreme Court decision, *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, wherein the Court held that "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request." (469 U.S. at 92, 83 L. Ed. 2d at 491, 105 S. Ct. at 491.) However, in that case the accused's statements were being recorded by a court reporter, so that it was clear from the record that the accused injected a clear and unambiguous request for counsel at the time he was being advised of his *Miranda* rights. In this case, however, as stated before, there was no evidence presented, at either the suppression hearing or at trial, that would indicate that defendant was asserting his right to remain silent. Therefore, we find it proper and necessary to consider all of O'Connor's testimony in order to determine the context in which the statements attributed to defendant were made.

■ Having determined that defendant did not invoke his right to remain silent, we must now consider whether defendant's waiver of his rights was knowing, intelligent and voluntary. Since the uncontroverted evidence is that defendant was properly admonished of his *Miranda* rights, we must determine whether defendant understood these rights and voluntarily waived them, whether he was coerced into making a statement or whether his will to remain silent was overborne. (See *People v. Martin*, 102 Ill. 2d at 426-27.) As stated earlier, to determine whether a statement was made voluntarily it is necessary to look at the totality of the circumstances and the court need not be convinced beyond a reasonable doubt, it need only appear from the manifest weight of the evidence that the statement was not the product of compulsion or inducement of any sort. *People v. Cooney* (1985), 136 Ill. App. 3d 989, 484 N.E.2d 802.

In this case defendant claims that the officer's friendly conversa-

tion with him about baseball and other topics not directly related to the crime was an attempt to elicit an incriminating response and "undermine his will to resist." Although the officer's conversation with defendant may have been a tactical maneuver, we find nothing improper under the circumstances of this case. We have already determined that defendant did not express a desire to remain silent, so that the interrogation need not have ceased merely because defendant denied culpability. Thus, engaging defendant in friendly conversation was not a ruse used to compel defendant to speak against his will.

Furthermore, the record reveals that defendant was not subjected to lengthy interrogation, was not physically abused or threatened. He was also not promised anything in return for his confession. In fact, the evidence was to the contrary since O'Connor testified that when defendant asked whether he could "go light" on codefendant if a statement was given, defendant was told emphatically that the officer had no authorization to make a deal. In addition, it appears that defendant was of normal intelligence and had had contact with the criminal justice system on at least one prior occasion. We find that the manifest weight of the evidence supports the trial court's determination that the totality of the circumstances indicated that defendant's statements were made voluntarily.

We note too that defendant made a subsequent statement to the assistant State's Attorney and that defendant raises no independent basis for his argument that this statement was involuntary. Rather, he claims that this statement was involuntary by virtue of the fact that it was tainted by the prior involuntary statement to Officer O'Connor. Having found that the statement to O'Connor was voluntary, it could not have tainted the subsequent statement to the assistant State's Attorney and so we find this statement to have been voluntary as well.

■ We now consider whether defendant invoked his right to have counsel present at the time of questioning. The only evidence that defendant requested counsel came from the testimony of defendant's aunt, Barbara Gelardi, at the suppression hearing. She testified that on March 4, 1985, between 9 and 11 p.m. she received a telephone call from defendant and that he indicated that he was at the police station at 39th and California and that "they" wouldn't allow him to use the phone to call his mother or his lawyer.

As stated earlier, once the State has made a *prima facie* showing that defendant waived his *Miranda* rights, as the State did here, the burden is placed upon the defendant to produce sufficient evidence to rebut the State's evidence. (*People v. Reid*, 136 Ill. 2d 27.) The trial court must then be convinced by a preponderance of the evidence that

defendant waived his rights and that the waiver was knowing, intelligent and voluntary. (*People v. Cozzi* (1981), 93 Ill. App. 3d 94, 416 N.E.2d 1192.) In this case the trial court considered defendant's evidence and found that it lacked credibility. Furthermore, the court found that, even if it were to believe that a telephone call took place, this testimony did not establish that defendant ever communicated a request for counsel to the police.

We agree that the evidence presented by defendant did not sufficiently rebut the State's evidence and that the State met its burden of proving, by a preponderance of the evidence, that defendant waived his right to counsel. The testimony of defendant's witness was highly questionable. For one thing, it was internally inconsistent since Gelardi testified that she received the telephone call on March 4, 1985, and that defendant indicated that he was at 39th and California. However, it was established that on March 4, 1985, defendant was at the station at 63rd and Louis and he was not moved to 39th and California until March 5, 1985. Furthermore, although Gelardi testified that she notified defendant's mother that he was arrested and being held at the police station, defendant's mother, who was present at the evidentiary hearing, did not corroborate this testimony.

Consequently, we conclude that defendant presented no credible evidence that he requested counsel at any time prior to his interrogation and that the trial court did not err by refusing to suppress defendant's statements. We agree with defendant that the trial court's alternative determination (that had defendant requested counsel on March 4, 1985, the subsequent interrogation on March 5, 1985, was proper due to sufficient attenuating circumstances) was erroneous. However, this does not necessitate reversal of the trial court's ruling on the motion to suppress. When asked to review a trial court's judgment, we need only affirm the correctness of that judgment and not the validity of the rationale and we may sustain the judgment based upon any reason discernible from the record. *People v. Ortiz* (1988), 170 Ill. App. 3d 1083, 524 N.E.2d 1050; *People v. Bolden* (1987), 152 Ill. App. 3d 631, 504 N.E.2d 835.

Defendant's third issue asks whether it was error to have admitted into evidence testimony that defendant was arrested because the car he was driving matched a reported stolen vehicle. The trial court ruled, over defendant's objection, that the evidence was admissible as "part of a continuing narrative which explained the circumstances surrounding the defendant's arrest." We agree.

■ Whether other crimes evidence should be admitted at trial is a decision left to the sound discretion of the trial court, which shall

not be overturned absent a clear showing of an abuse of discretion. (*People v. Young* (1983), 118 Ill. App. 3d 803, 455 N.E.2d 845.) Other crimes evidence is inadmissible to show that the accused has a propensity to commit crimes, but is admissible for almost any other purpose. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) For example, other crimes evidence is admissible to show motive, intent, knowledge, plan, design, or identification. (*People v. Connor* (1988), 177 Ill. App. 3d 532, 532 N.E.2d 520.) Another proper purpose is to explain the circumstances or context of the defendant's arrest. *People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59; *People v. Hunley* (1989), 189 Ill. App. 3d 24, 42, 545 N.E.2d 188.

■ In the present case defendant was arrested over six months after the sexual assault for which he was being prosecuted. Thus, we believe that the trial court did not abuse its discretion by allowing the limited reference to the stolen motor vehicle offense to explain the context and circumstances of defendant's arrest.

Defendant also argues that the trial court erred by instructing the jury that the other crimes evidence could be considered on the issue of identification of defendant as the offender. We note, however, that defendant did not object to this instruction at trial nor did he raise this claim in his post-trial motion. Therefore, the error, if any, was waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) But even if we were not to deem this issue waived, the giving of the instruction, if error at all, was not of the magnitude of plain error and, at best, was harmless error when viewed in light of the overwhelming evidence of defendant's guilt. See *People v. Bartall*, 98 Ill. 2d 294, 456 N.E.2d 59.

Next, defendant argues that it was error to have admitted into evidence the contents of an Illinois Bell customer service record. Defendant charges that he was denied his right of confrontation by the admission of this "unreliable hearsay evidence" which, he claims, was not qualified as a business record.

The business record exception to the hearsay rule has been codified in section 115—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 115—5). Subsection (a) states as follows:

> "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a

reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

See also *People v. Holowko* (1985), 109 Ill. 2d 187, 486 N.E.2d 877.

■ At trial the State produced evidence that on September 19, 1984, someone purchased a video cassette recorder at a J.C. Penny Co. store using J.S.'s credit card. The keeper of the records for Illinois Bell was permitted to testify that, according to their customer service records kept in the normal course of business, the telephone number that was given at the time the credit card purchase was made was registered to Stanley Gicla. Under these circumstances, the trial court properly ruled that this evidence was admissible pursuant to the business records exception to the hearsay rule.

Defendant also raises the oft claimed error of prosecutorial misconduct, arguing, specifically, that the prosecutor, in closing and rebuttal argument, exaggerated the evidence, distorted their burden of proof, misstated the function of the jury and engaged in character assassination of an essential defense witness. While certain comments made by the prosecutor may not have been entirely appropriate, we do not find them to constitute reversible error.

In general, prosecutors are given rather wide latitude in their closing and rebuttal argument and the only requirement is that it be based on the evidence or be a reasonable inference drawn therefrom. (*People v. Hunley*, 189 Ill. App. 3d at 43.) When reviewing allegations of prosecutorial misconduct, the complained-of remarks must be considered in the context of the entire closing arguments of both the State and the defendant (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E.2d 970) and where the complained-of remarks are within the rebuttal argument, they will not be held improper if they appear to have been provoked or invited by the defense counsel's argument. (*People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291.) Even where a comment or remark is found to be improper, it will not be grounds for reversal unless it results in substantial prejudice to defendant. (*People v. Morgan* (1986), 112 Ill. 2d 111, 132, 492 N.E.2d 1303.) Furthermore, if the improper remark was unobjected to at trial and not raised in the post-trial motion, any error is waived (*People v. Cisewski*, 118 Ill. 2d 163, 514 N.E.2d 970) unless the remarks are so prejudicial as to deprive defendant a fair trial or so flagrant as to threaten deterioration of the judicial process. *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 526 N.E.2d 525.

■ In this case defendant calls into question several remarks made by the prosecutor, only one of which was objected to at trial. Thus any error could be deemed waived. However, even if not waived, our examination of the record discloses no error. Defendant contends that the State exaggerated the identification testimony that was given by the victim when it suggested that a "snapshot" or "camera in [her] mind" went off. But our review convinces us that this argument was merely an allowable inference that could be drawn from the evidence.

Defendant also argues that when the State indicated in rebuttal that "[a]pparently, [defense] counsel would have you believe" that co-defendants were "framed" and later denied that a "conspiracy" existed, this argument was an attempt to distort the burden of proof. But these remarks, examined in context, were responses to defense counsel's argument. Nor do we believe that the State's comment "she [the victim] depends on you for justice" was a perversion of the non-partisan nature of the jury. (See *People v. Thomas* (1986), 146 Ill. App. 3d 1087, 497 N.E.2d 803.) Rather, it appears to urge the fearless administration of justice (see *People v. Stiff* (1989), 185 Ill. App. 3d 751, 542 N.E.2d 392) and as such, it was proper.

The only complained-of remark which was objected to at trial was made in reference to defendant's expert witness. The trial court upheld the objection and instructed the jury to disregard it. This instruction corrected the error. (*People v. Cisewski*, 118 Ill. 2d 163, 514 N.E.2d 970.) Although defendant also argues that the State engaged in "character assassination" of this expert witness when the prosecutor referred to him as a "hired gun," this remark was not objected to at trial. While we do not approve of such remarks, it, too, appears to be a response to defendant's closing argument, wherein the expert was declared "not in the least bit prejudiced" in favor of the defendant.

Finally, even if we had found any portion of the prosecutor's closing and rebuttal arguments to have been improper, it could not have substantially prejudiced defendant in light of the overwhelming evidence against him and so would not have warranted reversal. *People v. Morgan*, 112 Ill. 2d 111, 492 N.E.2d 1303.

In his last issue on appeal defendant asks this court to exercise its authority pursuant to Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), to reduce his sentence to a nonextended term of years. For reasons which follow, we decline defendant's invitation to decrease his term of imprisonment.

Defendant was found guilty of aggravated criminal sexual assault,

a Class X felony, which carries a sentence of not less than six years and not more than 30 years. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(c), 1005—8—1(a)(3).) However, at the sentencing hearing, the State asked that defendant be sentenced pursuant to the extended-term provision of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(2)), which would allow for a term of up to 60 years' imprisonment to be imposed. The State argued that defendant was eligible for an extended term under sections 5—5—3.2(b)(1), (b)(2), and (b)(5) of the Code. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.2(b)(1), (b)(2), (b)(5).) In addition, the State provided the trial court with evidence that in 1969 defendant had been charged under nine separate indictment numbers with a variety of crimes, including rape (three separate indictments), aggravated battery, aggravated assault (two separate indictments), theft (two separate indictments), robbery, armed robbery, and theft of an automobile. Defendant pled guilty and was convicted of these crimes and later sentenced to concurrent terms of 9 to 15 years' imprisonment. Defendant was also convicted in 1981 of attempted robbery and sentenced to 30 months' incarceration. After hearing this evidence and other proffered factors in aggravation and mitigation, the trial court sentenced defendant to the maximum extended-term sentence of 60 years' imprisonment, stating:

"Further, the record of this particular defendant which includes prior convictions of rape, there is every reason to believe the defendant would, that if given the opportunity, he would commit precisely the same kinds of acts.

I believe it is essential that he be removed from society for as long as possible for the protection of all members of society. I have considered the matters brought to my attention by way of hearing here this afternoon and by way of the presentence report. I believe that he is eligible for the extended term on each three sections [sic] made reference to by the State; and I would further note that if it is found that he is eligible only on one of the three, the sentence would remain the same."

Now on appeal, defendant challenges his extended-term sentence on two grounds: (1) that he was not eligible for an extended term under section 5—5—3.2(b)(1); and (2) that, although he was eligible for an extended term under sections 5—5—3.2(b)(2) and (b)(5), the fact that the trial court did not impose an extended term on codefendant Gicla precluded the imposition of the extended term on him.

■ We first address defendant's contention that he was not eligible for an extended term pursuant to section 5—5—3.2(b)(1). Defend-

ant presents two arguments in support of this position: (a) that his 1969 convictions may not be used to enhance the sentence to an extended term because they did not occur within the 10-year period prior to his current conviction; and (b) that his 1969 rape conviction was not a conviction for a crime of the same or greater class as his current conviction.

We note that section 5—5—3.2(b)(1) states as follows:

"[T]he following factors may be considered by the court as reasons to impose an extended term sentence under section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:

(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, *excluding time spent in custody*, and such charges are separately brought and tried and arise out of different series of acts." (Emphasis added). Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(1).

We interpret this statute to mean that defendant would be eligible for an extended-term sentence if he committed a felony in Illinois, which was of equal or greater classification, within a 10-year period prior to his current conviction, exclusive of time spent in the custody of any State or Federal correctional authority. (See *People v. Robinson* (1982), 89 Ill. 2d 469, 433 N.E.2d 674.) The date of sentencing, in this case, November 14, 1986, is the date of defendant's current conviction for purposes of applying this statute. (See *Robinson*, 89 Ill. 2d at 476-77.) This means that if defendant committed a Class X felony within a 10-year period prior to November 14, 1986, then he would be eligible for an extended-term sentence. Any time spent in the custody of State or Federal authorities may not be considered as part of the 10-year period.

In this case defendant's prior crimes were committed in 1969 and he was incarcerated until September 1976, when he was paroled. Defendant argues that the 1969 convictions may not be considered because he was no longer "in custody" as of September 1976 and, thus, his 1969 convictions fall outside the 10-year time frame. The State, however, argues that defendant would still have been on parole in November 1976 and, as such, would have been "in custody" within the meaning of the statute. We agree.

When defendant was paroled in 1976, article 123 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1971, ch. 38, par. 123—1 *et seq.*) would have governed defendant's status upon parole. According to section 123—4 (Ill. Rev. Stat. 1971, ch. 38, par. 123—4), defendant

could not have been discharged from parole unless he served at least six months and he had not violated any laws or conditions of parole during the six-month period. Only then, upon approval of the Governor, would defendant have been eligible for "final release," which would "operate as a commutation of sentence and release of such person from supervision and custody." Consequently, defendant was undoubtedly "in custody" within the meaning of the statute, in November 1976 and, therefore, any of defendant's 1969 convictions, if Class X or greater, could be considered and would support the application of the extended term.

As an aside, we note, too, that defendant had additional arrests and convictions within the period between November 1976 and November 1986. While it does not appear that any conviction was for a Class X felony (attempted robbery conviction on September 3, 1981), defendant was incarcerated for this conviction for approximately one year, until September 1982, when he was paroled. Since defendant would have been "in custody" during the periods of his incarceration, parole and/or mandatory supervised release, these periods, too, may be deducted from the 10-year period when applying the extended-term provision in the statute. See *People v. Robinson,* 89 Ill. 2d 469, 433 N.E.2d 674.

■■ This brings us to the second prong of defendant's argument, whether defendant's prior conviction for rape was a conviction for the same or greater class felony as his current Class X felony for aggravated criminal sexual assault. Defendant argues that when he was convicted for the offense of rape in 1969, the offense was unclassified. But when comparing the elements of that offense to the current classifications for sex offenses, the offense of rape would constitute the offense of criminal sexual assault, a Class 1 felony. Consequently, defendant contends that his 1969 conviction for rape should be deemed a Class 1 felony and, as such, it may not serve to enhance his current sentence to an extended term. We disagree. This exact argument was rejected in *People v. Sims* (1988), 166 Ill. App. 3d 289, 304, 519 N.E.2d 921, which held that a 1965 conviction for rape could be considered as a Class X felony, since the offense of rape, prior to the abolition of that offense category in 1984 with the introduction of the amendatory act of 1983, was a Class X felony. See also *People v. Terry* (1988), 177 Ill. App. 3d 185, 532 N.E.2d 568.

Whats more, although defendant states that the most serious offense for which he was convicted, prior to his current conviction, was rape, our review of the record discloses that defendant was also convicted in 1969 of armed robbery, a Class X felony, and thus, this con-

viction, too, could serve as the predicate felony for applying the extended term.

Lastly, as defendant concedes, he is eligible for an extended-term pursuant to sections 5—5—3.2(b)(2) and (b)(5). We believe that the fact that the trial court did not choose to use these provisions, although applicable, to impose an extended-term sentence on codefendant Gicla, does not serve to preclude their use to impose an extended term on defendant. Each defendant is to be sentenced as an individual. When fashioning a proper penalty, the trial court may consider the degree of each defendant's participation in the offense and recognize the differences in the defendants' rehabilitative potential, background and criminal record. (*People v. Diaz* (1989), 189 Ill. App. 3d 473, 478, 545 N.E.2d 399; *People v. Barfield* (1989), 187 Ill. App. 3d 190, 204-05, 543 N.E.2d 812.) A reviewing court should give great weight to the judgment of the sentencing court and, absent a clear showing of an abuse of discretion, the trial court's sentence may not be altered. *People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.

We find that in this case the trial court did not abuse its discretion and that the disparity between the sentences of defendant and codefendant was justified by the fact that defendant had an extensive criminal history, which included conviction for similar sex crimes, and because the record indicates that defendant's degree of participation in the present offense was greater and that he was the defendant who was armed with a knife and threatened the victim's life.

The judgment and sentence entered by the circuit court of Cook County is affirmed.

Affirmed.

COCCIA, P.J., and LORENZ, J., concur.