2020 IL App (1st) 172113-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
July 28, 2020

No. 1-17-2113

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| v. | ) | |
| | ) | No. 16-CR-8223 |
| ERROL McDADE, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Mary Margaret Brosnahan, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Trial court did not abuse its discretion in admitting an excessive amount of evidence of other incidents of domestic violence involving defendant and victim. Trial court properly determined that defendant was eligible for extended-term sentence.

¶ 2    Defendant Errol McDade was convicted in a jury trial of domestic battery, arising out of an incident involving a victim we identify as "C.M.," that occurred on March 19, 2016. He was acquitted of a charge of aggravated domestic battery. He was sentenced on the conviction to an extended term of nine years imprisonment. On appeal, defendant argues that (1) the trial court erred by allowing the State to present an excessive amount of evidence of other incidents of

domestic violence involving defendant and C.M., which resulted in substantial prejudice to him, and (2) the trial court improperly imposed an extended-term sentence for which he was not eligible. For the following reasons, we affirm the conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4        Prior to trial in this case, the State sought leave to admit evidence of ten other incidents, in addition to the incident at issue of March 19, 2016, in which defendant had allegedly committed acts of domestic violence against C.M. The trial court determined that the State could admit evidence of six of the ten incidents, spanning a timeframe from May 28, 2007, through April 7, 2016. It denied the State leave to present evidence of the other four incidents, allegedly occurring between 2000 and 2003, finding that they were too remote in time.

¶ 5        The case proceeded to a jury trial. In opening statements, the Assistant State's Attorney told the jury that C.M. would testify about the hard and difficult life she had led, due in part to her on-and-off relationship with defendant for 20 years, and "about the countless times he has abused her, beaten her, hit her."

¶ 6        The State called C.M. as its first witness. She testified that she was 52 years old, and that she and defendant had a dating relationship off and on for over 20 years. They had one child together, who was then 21 years old. At the time of the incident at issue, she was living in the garden unit of a three-floor apartment building. Access to the interior of the building required either use of a key or having the door unlocked through the building's buzzer system. Defendant had been staying in C.M.'s apartment and keeping some of his things there since August 2015, but he did not have a key.

¶ 7        C.M. testified that in the early afternoon of March 19, 2016, defendant left the apartment to go to work. After he left, C.M.'s other boyfriend, Paul Williams, came to the apartment. A short

time later, defendant returned and knocked on a window to the apartment. Before having any interaction with defendant, C.M. let Williams out of the apartment's back door because she thought an altercation would occur if she did not do so. She left the door open.

¶ 8    She testified that she was in fear for her life of defendant, so she called 911 and told the operator that her boyfriend had beaten her up and taken her keys and wallet. She admitted that, as of the time she called 911, defendant had not done those things. Asked on direct examination why she told the operator that defendant had beaten her up and taken her wallet and keys if he had not, she answered, "Because that was his MO. He did that all the time." The trial court overruled an objection to this testimony.

¶ 9    After hanging up with 911, C.M. opened the front door to her apartment to see if defendant was still outside. By the time she did so, he had gotten inside the building. Defendant came into the apartment, and they got into an argument about the back door being open. He accused her of letting someone out of the apartment. C.M. testified that she started to make her way to the front door of the apartment to leave, but defendant pulled her by her hair and then started to choke her. He grabbed her around the neck with his hands and squeezed, at which point she could barely breathe. As he did this, he was taking her down the hallway of the apartment toward the washroom. When they reached the door of the washroom, defendant pushed her and kicked her in the stomach. She fell into the bathtub and hit the back of her head. As she was getting out of the bathtub, defendant hit her again in the stomach with his fist. This knocked the wind out of her, and she dropped to her knees. She started again to get up slowly, and defendant then hit her again twice in the chest with his fist. He also hit her in the face with both fists. During this time, he was cussing her out and telling her that he ought to kill her.

¶ 10    Eventually defendant went into the bedroom and calmed down somewhat, at which point

C.M. began cleaning herself up in the washroom. Defendant came back in and hit her again. While she was in the washroom, she received a phone call from the 911 operator, stating that the police were at her apartment and needed to be let inside. She told the operator that she was unable to let the police in, because she was afraid of defendant. Defendant then came into the washroom and asked her who she was talking to. She said nobody, and he took her phone from her. Eventually he took her keys and wallet from her also.

¶ 11        C.M. lay on the bed because she was hurting and eventually fell asleep. When she woke up the next morning, defendant was asleep in the bed next to her. C.M. snuck out of the apartment and called the police. A police officer came, picked her up, and took her back to the apartment. When she went inside with the officer, defendant was not there. The back door was open. C.M. showed the officer her injuries, which consisted of several knots on her head. No photos were taken of her injuries, and she did not seek medical treatment for them.

¶ 12        C.M. testified that the incident she had just described was not the first time she had experienced violence at the hands of defendant. She then testified about five prior specific incidents. First, she described that on April 7, 2016, she encountered defendant while she was walking near her sister's house. He was across the street from her. He brandished a knife and told her he was going to kill her. C.M. and her sister flagged down a police car, and defendant ran away. She told the police about the incident, and a police report was created.

¶ 13        Second, she described that on March 23, 2016, she was at a library with her sister and Williams when defendant came in and told her that he needed to arrange to get his things from her apartment. C.M.'s sister told defendant to go away, and the two of them started arguing. Defendant pulled a knife from his bag, and C.M.'s sister pulled a knife also. They were all escorted out of the library, and defendant was arrested. C.M. thought she saw a gun in defendant's bag and reported

this to the police, but it turned out that he did not have a gun.

¶ 14     Third, she testified that on March 15, 2015, she and defendant got into a fight, during which defendant stabbed her in the hand with a wine corkscrew. She called the police, and a police report was created. She testified that two of her fingers were fractured in this incident, and she required medical treatment for her injuries.

¶ 15     Fourth, she testified that on August 9, 2009, she and defendant got into a fight in which defendant broke a broom across her head. She was bleeding and required medical treatment at the hospital for a head laceration.

¶ 16     Fifth, she testified that on May 28, 2007, she and defendant got into an argument while they were at a bar. She went into the washroom because she did not want to fight, but defendant kept shouting threats at her and telling her to come out. When she came out of the washroom, defendant hit her and knocked her to the ground. The police were called, a report was created, and defendant was ultimately convicted of domestic battery.

¶ 17     On cross-examination, C.M. testified that she and defendant had a shared history of drug and alcohol abuse and of homelessness. She admitted she told the 911 operator that her ex-boyfriend had jumped on her and taken her keys and that she was outside the house, and none of those things were true. Asked if she lied then, she answered, "Maybe at that moment, but when—before it was all over with, it happened just like that because that's his routine, that is his MO, and he does it all the time to me." She testified that she and defendant were under the influence of drugs and alcohol at the time of the third, fourth, and fifth incidents above.

¶ 18     On redirect examination, C.M. testified that as of the first time she called 911, she was in fear for her life. She testified that defendant had previously stabbed her, struck her with things such as a broomstick, and put her in the hospital on more than one occasion.

¶ 19     The State's next witness was Officer Jason Venegas of the Chicago Police Department. He testified that on the morning of March 20, 2016, he responded to a call involving C.M. Upon his arrival, he noticed a swollen bump on her head with some redness to it. He testified that C.M. told him that the person who injured her was defendant, whom she described as her ex-boyfriend. C.M. let Officer Venegas into her apartment through the rear door, which was slightly ajar. Officer Venegas did not see defendant at the apartment. He asked C.M. if she wanted to go to the hospital, but she declined. He called for an evidence technician to photograph the injuries to C.M.'s forehead.

¶ 20     The State's third and final witness was Officer Michael Putrow of the Chicago Police Department. He testified about how defendant came to be arrested on May 1, 2016.

¶ 21     After the State rested, the defense moved for a directed verdict. The trial court denied this motion. The defense then introduced into evidence the audio of C.M.'s call to 911 on March 20, 2016, after which the defense rested.

¶ 22     Prior to closing arguments, the trial court instructed the jury regarding the limited purposes for which it could consider the evidence of defendant's involvement in conduct other than that for which he was charged. In closing arguments, the Assistant State's Attorney discussed this instruction and the five specific incidents to which C.M. testified. Defendant's attorney's closing arguments focused heavily on C.M.'s lack of credibility, including that she lied by telling the 911 operator that defendant had beaten her up when this had not then occurred. In rebuttal closing argument, the Assistant State's Attorney stated that the reason their relationship did not work was not because of drug addiction, but it was "because this defendant has beaten her for God knows how long." The Assistant State's Attorney also argued stated that defendant had beaten her and taken her keys and phone from her "[o]ver and over and over again."

¶ 23    The jury found defendant guilty on the charge of domestic battery, but it found the defendant not guilty of the charge of aggravated domestic battery.

¶ 24    At sentencing, the parties agreed that the permissible sentencing range was between 3 and 14 years, which reflected defendant's statutory eligibility for an extended term based on a prior conviction for a class 2 felony on February 7, 1997. Defendant's attorney stated that he had reviewed the State's calculation of the time defendant spent in custody since that date, and excluding such time, less than ten years had lapsed since the previous conviction. The trial court sentenced defendant to an extended term of nine years in the Illinois Department of Corrections.

¶ 25                                II. ANALYSIS

¶ 26                    A. Other Incidents of Domestic Violence

¶ 27    Defendant's first principal argument on appeal is that the trial court erred in permitting the State to present excessive evidence of other incidents of domestic violence involving him and C.M. He does not challenge the trial court's determination that this was relevant evidence. Rather, he argues that the trial court's failure to limit the presentation of this evidence resulted in substantial prejudice to him, because, given the weakness of the State's evidence against him for the actual offense charged, it allowed the State to portray him to the jury as a bad person by presenting a case heavily focused on evidence of a history of domestic violence, as opposed to a case focused on the evidence of the offense for which he was actually charged.

¶ 28    As a common law rule of evidence, the fact that a defendant has committed other crimes is admissible, provided its relevance is for a purpose other than showing a defendant's propensity to commit crimes. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). Proper purposes include, but are not limited to, demonstrating motive, intent, identity, and absence of mistake. *Id.* The supreme court has held that " 'evidence of other crimes committed by the defendant may be admitted if relevant

to establish any material question other than the propensity to commit a crime.' " *People v. Pikes*, 2013 IL 115171, ¶ 13 (quoting *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991)). This rule is codified as Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011).

¶ 29    In criminal prosecutions where the defendant is accused of an offense of domestic violence, a specific statutory exception to this rule exists in section 115-7.4 of the Code of Criminal Procedure of 1963, which provides that "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2016). Section 115-7.4 thus permits the use of this evidence to establish a defendant's propensity to commit a crime of domestic violence, as well as for other relevant purposes. *Dabbs*, 239 Ill. 2d at 295. However, evidence potentially admissible under this statute or otherwise may be excluded if the risk of undue prejudice outweighs its probative value. *Id.* at 289-90.

¶ 30    Defendant argues in this case that the trial court violated the principle that, when evidence of other crimes or wrongs is admitted, this should not lead to a trial-within-a-trial of the collateral misconduct, and the trial court should limit the detail elicited to what is necessary to illuminate the issue for which the evidence was introduced. See *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). The risk is that a jury hearing too much of this evidence may convict a defendant solely upon the belief that he is a person of bad character and therefore likely to have committed a crime. *Id.* at 431. Defendant notes that this court has reversed convictions where it has determined that a trial court permitted the jury to hear a prejudicial amount of evidence of crimes other than the one charged. See *id.* at 433; *People v. Thigpen*, 306 Ill. App. 3d 29, 39 (1999). Our standard of review is whether the trial court abused its discretion in admitting this evidence. *Nunley*, 271 Ill. App. 3d at 432.

¶ 31    Defendant's argument has several aspects. First, he contends that the trial court's ruling allowing the State to present evidence of five specific incidents of domestic violence was excessive, especially when two of the incidents occurred, respectively, six and eight years before the incident at issue.[1] Defendant argues that regardless of the relevance of this evidence, the trial court failed to properly limit the State's presentation of it. He contends the State "inundated" the jury with evidence of other incidents of domestic violence "that went beyond what was necessary or relevant." He points out that C.M.'s testimony about the other incidents on direct examination comprised 8 pages of the trial transcript, whereas the remainder of her direct examination comprised 23 pages.

¶ 32    Additionally, he argues that the trial court compounded the above error by failing to orally instruct the jury as to the limited purpose for which this evidence could be considered at the time the evidence was admitted. See Illinois Pattern Jury Instructions, Criminal, No. 3.14, Committee Note (approved Oct. 17, 2014).

¶ 33    Relatedly, he contends the State excessively focused the jury's attention on the evidence of the other incidents. He points out that in opening statements, the Assistant State's Attorney referred to C.M.'s testimony about the " 'countless times' " defendant had " 'abused her, beaten her, hit her.' " In closing arguments, the Assistant State's Attorney made a statement that defendant " 'has beaten her for God knows how long.' " Defendant contends these statements implied additional instances of domestic violence beyond the five instances to which C.M. testified. He also contends the Assistant State's Attorney told the jury that the evidence of the other incidents was " 'the most compelling evidence in this case.' " He argues that a prosecutor's emphasis on other-crimes

---

[1] The trial court's specific ruling was that the State could present evidence of six incidents, but no evidence was presented of an incident that allegedly occurred in 2008.

evidence in closing arguments has been considered to aggravate the prejudicial impact of the admission of this evidence. See *Nunley*, 271 Ill. App. 3d at 432; *Thigpen*, 306 Ill. App. 3d at 38-39.

¶ 34       As to the first aspect of defendant's argument, we conclude that the amount of evidence the State presented concerning other incidents of domestic violence was not excessive or unduly prejudicial. Prior to trial, the trial court determined that these five incidents, all of which occurred within an eight-year period of the incident at issue, were sufficiently proximate in time and showed a "continuing course of conduct" by defendant toward C.M. The trial court reasoned that the risk that a trial-within-a-trial would result or that defendant would be unduly prejudiced was reduced by the fact that C.M. was a victim in and would testify about all five incidents, and all five incidents were corroborated by police reports. The determination to allow the State to present evidence of the five incidents was well within the discretion of the trial court.

¶ 35       Upon reviewing the evidence that the State presented pursuant to this ruling, we find that the facts of the five incidents were presented concisely and without unnecessary detail. See *supra* ¶¶ 12-16. It does not appear that the State's presentation of this evidence consumed an excessive amount of time at trial or was somehow inappropriate to the evidence presented on the charged offense. *Cf. Nunley*, 271 Ill. App. 3d at 432-33 (murder and armed-robbery conviction reversed where State repeatedly elicited gruesome details of defendant's later stabbing of his mother in attempt to decapitate her and killing of her dog). We thus reject the argument that the trial court allowed an excessive amount of this evidence or permitted a trial-within-a-trial concerning it.

¶ 36       We also reject the argument that the trial court committed any error in failing to orally instruct the jury as to the limited purposes of the evidence at the time it was first admitted. Defendant does not direct our attention to any point during testimony where the giving of such an instruction was

requested and refused. It has been held that, although the better practice is for trial courts to instruct the jury at the time that other-crimes evidence is admitted of the limited purpose for which it may be considered, the failure to do so does not mandate reversal if the jury is properly instructed at the close of the case. *People v. Heard*, 187 Ill. 2d 36, 60-61 (1999). Here, an appropriate instruction was given at the close of evidence prior to closing arguments, and there is no contention that the jury was not properly instructed at that time.

¶ 37 As to defendant's arguments concerning the Assistant State's Attorney's comments in opening statement and closing argument, the State contends that defendant forfeited any claim that the comments were improper by failing to object to them at trial. In reply, defendant makes clear that his argument is not that these comments were improper, but rather it is that the State's focus on the prior incidents of domestic violence in its opening statement and closing argument exacerbated the trial court's failure to limit the evidence of these prior incidents. He argues these comments added to the prejudice inflicted on him by allowing the State to introduce five prior incidents of domestic violence dating back eight years. As discussed above, we reject defendant's argument that the trial court admitted excessive evidence of other incidents of domestic violence and thereby caused him unfair prejudice. As such, we also reject the argument that comments in opening statement or closing argument exacerbated the failure to limit evidence or added to any prejudice suffered by him.

¶ 38 Finally, defendant argues that the trial court erred in overruling his objection to C.M.'s testimony that the reason she told the 911 operator that defendant had beaten her up and taken her keys and wallet when he had not was "[b]ecause that was his MO. He did that all the time." Defendant contends that, because none of the incidents that were the subject of the pretrial motion involved defendant taking her wallet and keys, the State was thereby eliciting testimony of

incidents beyond those allowed by the trial court. He argues that C.M. was necessarily testifying to many additional incidents of domestic violence by defendant that happened " 'all the time.' "

¶ 39     We hold that the trial court did not abuse its discretion by allowing this testimony. Unlike the five specific incidents that were the subject of the pretrial motion, this testimony was specifically relevant for a reason other than showing defendant's propensity to commit domestic violence. Rather, it was relevant to explain why C.M. called 911 and told the operator that her boyfriend had beaten her up and taken her wallet and keys, when she admitted defendant had not done that at the time of the call. The defense's principal argument in the case was that C.M. was a liar, including because she had lied on that call to 911, and that she was fabricating a similar story before the jury. We find no abuse of discretion by the trial court in allowing C.M.'s testimony explaining why she had admittedly lied on that phone call to 911. See *People v. McFarland*, 259 Ill. App. 3d 479, 481 (1994).

¶ 40                                   B. Sentencing

¶ 41     Defendant's second principal argument on appeal is that the trial court improperly imposed an extended-term sentence when he was not eligible for one. He requests this court either reduce the extended-term sentence of 9 years imposed by the trial court to a sentence of 7 years, the maximum non-extended sentence for a class 2 felony conviction, or remand the case for a new sentencing hearing.

¶ 42     A defendant is eligible for the imposition of an extended-term sentence if he or she has been convicted previously of the same or similar class felony or of a greater class felony, and the present conviction has occurred "within 10 years after the previous conviction, excluding time spent in custody." 730 ILCS 5/5-5-3.2(b)(1) (West 2016). The issue raised by defendant's argument is whether the "time spent in custody" that must be excluded when calculating whether a present

conviction is "within 10 years after the previous conviction" includes only time spent incarcerated or whether it also includes time spent on parole. Defendant contends that only time spent incarcerated should be excluded, not time spent on parole.

¶ 43      The parties agree that the operative date of defendant's present conviction for purposes of this calculation is July 28, 2017, the date of his sentencing. It is also undisputed that he has a previous conviction of the same class of felony, which was a class 2 felony conviction for armed robbery for which he was sentenced on February 7, 1997. Further, the parties appear to agree that, if "time spent in custody" means only the time defendant spent incarcerated, then excluding that time means that slightly over 10 years lapsed between February 7, 1997, and July 28, 2017, and he would not be eligible for an extended term. However, if "time spent in custody" means the time that defendant spent incarcerated and the time he spent on parole, then slightly less than 10 years lapsed between the two dates, and he would be eligible for an extended term.

¶ 44      Defendant acknowledges that review of this alleged sentencing error was forfeited, because defendant's counsel did not object and raise this issue in a post-sentencing motion. See *People v. Harvey*, 2018 IL 122325, ¶ 15. Defendant urges this court to review the issue under the doctrine of plain error. Under this doctrine, a reviewing court may address a forfeited claim in circumstances where a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* "In addressing an assertion of plain error, it is appropriate to determine whether reversible error occurred at all." *People v. Jackson*, 2020 IL 124112, ¶ 81.

¶ 45      This court has held that a defendant on parole is still "in custody" for purposes of excluding

time under the statute, and thus periods of parole should be deducted from the 10-year period in calculating a defendant's statutory eligibility for an extended term. *People v. Smith*, 199 Ill. App. 3d 839, 857-58 (1990). In *Smith*, the defendant was convicted of a felony on November 14, 1986, and he had been convicted of a previous felony in 1969. *Id.* at 857. He argued that he was not eligible for an extended term because the previous conviction fell outside the 10-year time frame, as he had not been "in custody" once his period of incarceration ended in September 1976. *Id.* This court rejected the defendant's argument and held that he was still "in custody" after November 14, 1976, because he was still on parole as of that time. *Id.* The court considered that the defendant's status while on parole was governed by then-section 123-4 of the Code of Criminal Procedure, which provided that only when a defendant on parole met certain conditions for discharge would that defendant become eligible for " 'final release,' " which would " 'operate as a commutation of sentence and release of such person from supervision and custody.' " *Id.* at 857-58 (quoting Ill. Rev. Stat. 1971, ch. 38, § 123-4).

¶ 46 Defendant does not mention *Smith* in his opening brief. In his reply brief, he responds to the State's argument that *Smith* controls by arguing that the case was wrongly decided and should not control the outcome here. His argument is that the supreme court has stated that the purpose of the extended-term provision is " 'to impose harsher sentences on offenders whose repeated convictions have shown their resistance to correction. [Citation.] Realistically, one can assess an offender's tendency to recidivism only when, having served his sentence, he has returned to society; his behavior while in custody can hardly be viewed as a reliable indicator of the likelihood of his committing another offense when released.' " See *People v. Robinson*, 89 Ill. 2d 469, 476 (1982). He contends that this statement by the supreme court recognizes a distinction between a defendant " 'in custody' " and one " 'returned to society' " or " 'released,' " and the latter would

include a defendant on parole. He argues that a paroled defendant has many more opportunities to re-offend than an incarcerated defendant, so there is no justification for discrediting good behavior during parole.

¶ 47    We reject defendant's argument that *Smith* was wrongly decided. In *Robinson*, the supreme court was not addressing the question of whether "custody" meant parole as well as incarceration. Thus, we cannot conclude from the sentence upon which defendant relies that the supreme court was attempting to distinguish between incarceration and parole for purposes of the extended-term calculation. See generally *People v. Abdullah*, 336 Ill. App. 3d 940, 954-55 (2002) (rejecting argument that *Robinson* implied that periods of parole are not "time spent in custody" for purposes of section 33B-1(a) of the Habitual Criminal Act (720 ILCS 5/33B-1(d)(2) (West 2000))). We recognize, as the court did in *Smith*, that defendant here had the statutory status of being "in custody" of the Department of Corrections at all times when he was on parole between February 7, 1997, and July 28, 2017. See 730 ILCS 5/3-14-2(a) (West 2016) ("[t]he Department shall retain custody of all persons placed on parole *** and shall supervise such persons during their parole").

¶ 48    In conclusion, the time defendant spent on parole was properly excluded as "time spent in custody" when determining that his present conviction occurred "within 10 years after the previous conviction." 730 ILCS 5/5-5-3.2(b)(1) (West 2016). As such, the trial court did not err in determining that defendant was eligible for an extended-term sentence or by imposing an extended-term sentence on him.

¶ 49                                    III. CONCLUSION

¶ 50    For the foregoing reasons, defendant's conviction and sentence are affirmed.

¶ 51    Affirmed.